**UNITED STATES of America,**
**Plaintiff,**

v.

**STATE OF LOUISIANA et al.,**
**Defendants.**

**Civ. A. No. 2866.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Aug. 10, 1966.

Order Aug. 11, 1966.

Order of Clarification Aug. 12, 1966.

Second Order of Clarification
Sept. 20, 1966.

John Doar, Washington, D. C., Louis C. LaCour, New Orleans, La., Frank Dunbaugh, David Norman, Washington, D. C., Thomas Smith, D. Robert Owen, Washington, D. C., Martin Glick, for the United States.

Jack P. F. Gremillion, Frank L. Dobson, Thomas McFerrin, James E. Phillips, Jr., Baton Rouge, La., for the State of Louisiana.

Sidney Provensal, Jr., Edmond Fitzmaurice, Jr., New Orleans, La., for the Governor of Louisiana.

Before WISDOM, Circuit Judge, and CHRISTENBERRY and WEST, District Judges.

WISDOM, Circuit Judge.

In October 1963 the United States filed the original complaint challenging the constitutionality of the Louisiana application form as a test or device in determining the qualifications of applicants to register for voting.[1] The court heard the case November 30, 1964. Important events affecting the litigation have occurred since then.

In June 1965, the State of Louisiana revised its form of Application for Registration. August 6, 1965, Congress adopted the Voting Rights Act of 1965. On that same day, in accordance with Section 4(b) of the Act, the Attorney General of the United States determined that the State of Louisiana had on November 14, 1964, maintained a test or device within the meaning of the Act; the Director of the Census determined that less than 50 per cent of the persons of voting age residing in Louisiana voted in the November 3, 1964, presidential election. In August, the Attorney General of the United States certified that in his judgment the appointment of examiners was necessary to enforce the guarantees of the Fifteenth Amendment in East Carroll, East Feliciana, West Feliciana, Ouachita, and Plaquemines Parishes, Louisiana. Federal examiners entered on duty in each of these parishes and, except in Plaquemines Parish where the operation was suspended for a period of time, because of natural disaster, they have performed their duties under the Voting Rights Act of 1965 until the present time. By the end of November, the examiners in the five parishes had listed approximately 13,258 persons as eligible to vote and had certified and transmitted the names of these persons to the respective parish registrars, who under the Voting Rights Act, have the duty to place these names

---

1. The United States alleged and offered proof to show that (1) the form was applied initially only to Negroes, (2) Negroes were failed for insignificant errors while white persons were either provided assistance or were passed even though they made the same or similar errors as the Negroes who were rejected, and (3) that the form was not a reasonable test of literacy, but was designed and used to discriminate against Negroes, particularly in the age computation, preamble, householder, and have/have not sections of the form. These allegations have already been thoroughly briefed by the parties and the arguments presented will not be rehashed here. The additional relevance of that proof is that it alone would sustain the "appropriateness" of the Voting Rights Act of 1965.

on the official parish and municipal voting lists.

In three of the parishes—East Carroll, Plaquemines, and Ouachita—certain of the defendants filed suits in State courts[2] to enjoin the local registrars of voters from placing the names of persons listed by federal examiners on the official voting lists. In each instance the injunctions sought were entered. The registrars of voters in all five parishes where examiners are operating—East Carroll, East Feliciana, West Feliciana, Plaquemines, and Ouachita—refuse to place on the official voting lists of their respective parishes and municipalities the names of the persons certified and transmitted to them by the federal examiners.

November 15, 1965, the United States filed its Supplemental Complaint bringing before the court the changes in the law that occurred after this case was originally submitted and the events which followed those changes. The Supplemental Complaint requests that the defendants and their agents be restrained from (a) failing to place on the official voting lists the names of persons certified and transmitted by federal examiners, (b) complying with or giving force or effect to the state court injunctions, and (c) giving any force or effect to Louisiana statutes or constitutional sections which would prevent official listing of persons certified by federal examiners.

The defendants admit that they will continue to refuse to place on the official voting lists persons certified in the five parishes where examiners are operating—East Carroll, East Feliciana, West Feliciana, Plaquemines, and Ouachita. They contend that the principal operative provisions of the Voting Rights Act are unconstitutional, and in the alternative that the Director of the Bureau of Census, the Attorney General of the United States, and the Civil Service Commission have, in the event the Act is constitutional, misconstrued and misapplied its terms. The case was heard by this Court on December 21, 1965, and briefs were submitted by December 31, 1965.

At the time, the constitutionality of the Voting Rights Act was at issue in State of South Carolina v. Katzenbach, 1966, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed. 2d 769, then pending before the Supreme Court. The State of Louisiana and several other states participated in the proceeding as friends of the court. March 7, 1966, the Supreme Court announced its decision, holding certain provisions of the Act to be appropriate, constitutional means under the Fifteenth Amendment for carrying out the purposes of that amendment.

No facts peculiar to South Carolina or to Louisiana would alter the result reached as to the constitutionality of the particular sections[3] of the Voting Rights Act the court considered. This is clear from frequent references by the court to arguments proposed by States participating as *amicus curiae*, by absence of reference to unique factual considerations existing in South Carolina,[4] and by the broad sweep of the language employed by the Court in discussing the issues (see particularly 383 U.S. at 327–337, 86 S.Ct. 803).

As we read the State of South Carolina v. Katzenbach, the Supreme Court considered and rejected the States' argument on the following issues the defendants raise in the instant case:

(1) The Voting Rights Act of 1965 exceeds the power of Congress

---

2. The plaintiffs and defendants in the three state court actions have been made named defendants in this action. They are as follows: Plaintiff—The State of Louisiana by Jack P. F. Gremillion, Defendant—Cecil Manning (East Carroll); Plaintiff—L. H. Perez, Jr., Defendant—Roy Lyons (Plaquemines); Plaintiff—Alvin P. Lassiter, Defendant—Mae Lucky (Ouachita).

3. Sections 4(a)–(d), 5, 6(b), 7, 9, 13(a), and certain procedural portions of 14 (see 383 U.S. at 315–317, 86 S.Ct. 803).

4. To the contrary, most of the fact-finding of Congress and of the Supreme Court relates to situations in Alabama, Louisiana, and Mississippi.

and encroaches on an area reserved to the States by the Constitution * * * (383 U.S. at 323–329, 86 S.Ct. 803)

(2) Suspension of tests and devices for five years is inappropriate * * * (383 U.S. at 333–334, 86 S.Ct. 803)

(3) The formula provision is inappropriate legislation [5] * * * (383 U.S. at 329–333, 86 S.Ct. 803)

(4) Appointment of federal examiners is inappropriate * * * (383 U.S. at 335–337, 86 S.Ct. 803)

(5) The formula provision violates the principle of equality of States, denies due process by employing an invalid presumption and by barring judicial review of administrative findings, constitutes a forbidden bill of attainder, and impair the separation of powers by adjudicating guilt through legislation * * * (383 U.S. at 323–324, 86 S.Ct. 803)

(6) Limiting litigation to the District Court for the District of Columbia is inappropriate * * * (383 U.S. at 331–335, 86 S.Ct. 803)[6]

(7) The non-review provisions of the Act are arbitrary and deprive the States of due process * * * (383 U.S. at 323–337, 86 S.Ct. 803)

(8) The Director of the Bureau of Census and the Attorney General have misconstrued and misapplied the formula provision and the voting examiner provision * * * (383 U.S. at 323, 332–333, 335–337, 86 S.Ct. 803)

(9) The challenge procedure is arbitrary * * * (383 U.S. at 334–335, 86 S.Ct. 803)

The only issues remaining relate to the defendants' contentions that the Voting Rights Act was maladministered in Louisiana with respect to:

1. Administrative procedures for obtaining identifying data, and

2. Age and residency requirements for registration.

■■■ The Louisiana procedures for identification of applicants for registration are not in conflict with the Voting Rights Act. "The applicant shall in all cases be able to establish that he is the identical person whom he represents himself to be when applying for registration. If the registrar has good reason to be-

---

5. Louisiana has argued that the coverage formula is uniquely inapplicable and arbitrary as applied to it because it has the highest percentage of illiterates of any state and yet had 47% of its electorate turn out and cast a vote for Presidential candidates. (Louisiana advanced this same contention in its *amicus curiae* brief and argument before the Supreme Court.) South Carolina also argued that the coverage formula disregards various local conditions which have nothing to do with racial discrimination (383 U.S. at 329, 86 S.Ct. 803). The Court, noting that South Carolina is a State in which there was "fragmentary evidence of * * * discrimination" (Ibid.); nevertheless found the formula to be legitimate and rational. It buttressed its finding, in part, upon the fact that the formula imposing the remedies of the Act reaches Alabama, *Louisiana,* and Mississippi—"three States * * * in which federal courts have repeatedly found substantial voting discrimination." (Ibid.) The Court con-

cluded: These arguments, however, are largely beside the point. Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act. The formula eventually evolved to describe these areas was relevant to the problem of voting discrimination, and Congress was therefore entitled to infer a significant danger of the evil in the few remaining States and political subdivisions covered by § 4(b) of the Act. No more was required to justify the application to these areas of Congress' express powers under the Fifteenth Amendment.

6. The Supreme Court considered the constitutionality of § 14(b) and found it to be legitimate and appropriate (383 U.S. at 331–335, 86 S.Ct. 803). It follows that the State Courts in Plaquemines, East Carroll, and Ouachita Parishes lacked jurisdiction to issue injunctions. Their orders are void.

lieve that he is not the same person, he may require the applicant to produce two credible registered voters of his precinct to make oath to that effect." LSA–R.S. 18:37. See also La.Const.1921, art. 8, § 1(e). As long ago as 1952, however, Judge Gaston Louis Porterie held that the identification procedure could not be used in an arbitrary or discriminatory manner to prevent Negroes registering to vote; the court granted an injunction against a registrar of voters requiring him to register the Negro plaintiffs. Byrd v. Brice, W.D.La., 104 F.Supp. 442, aff'd 5 Cir., 201 F.2d 664. The defendants have not proved that the United States and its agents failed to observe the Louisiana statutory requirements as to identification of applicants.

■ We find that the United States and its agents correctly applied the Louisiana law relating to age requirements, but incorrectly applied the Louisiana law relating to residence requirements. LSA–R.S. 18:36. The agents approved the residential requirements of applicants who would be eligible to vote on the date of the next election rather than on the date of the application. In other respects, the United States and its agents properly administered the Voting Rights Act of 1965 and the uncontested provisions of Louisiana law not in conflict with the Voting Rights Act.

■ In granting the relief prayed for we have ordered election commissioners to give assistance to voters who are unable to read and write. Louisiana now allows and has always allowed illiterates to vote. Until 1960 Louisiana law provided that a voter "unable to read and write, shall receive the assistance of a commissioner of his own selection in the marking of his ballot". LSA–R.S. 18:350. In 1960, as one of a bundle of segregation statutes, the Louisiana legislature enacted Act 499 amending Section 350. This amendment provides, in part, "The inability to read or write shall not entitle a voter to assistance in the casting of his vote". This stultifying provision conflicts with the Voting Rights Act of 1965. The Act pro-

vides for the suspension of literacy tests in states which have used such tests as a discriminatory device to prevent Negroes from registering to vote. Like any other law, this provision implicitly carries with it all means necessary and proper to carry out effectively the purposes of the law. As Louisiana recognized for 150 years, if an illiterate is entitled to vote, he is entitled to assistance at the polls that will make his vote meaningful. We cannot impute to Congress the self-defeating notion that an illiterate has the right pull the lever of a voting machine, but not the right to know for whom he pulls the lever.

We hold the Voting Rights Act of 1965 constitutional, hold the challenged provisions of Louisiana law unconstitutional, and grant the injunction, in accordance with the following order.

### ORDER

This matter came on for a hearing on the merits of the application of the United States for a permanent injunction. The court makes the following findings:

(1) Sections 2, 4(a)–(d), 5, 6, 7, 9, 12(d), 12(f), 14(b) and 14(c) of the Voting Rights Act of 1965 are an appropriate and constitutional means for carrying out the Fifteenth Amendment and the constitutional responsibilities of Congress.

■ (2) The provisions of Article VIII, Sections 2 and 18 of the Constitution of Louisiana and Sections 31(2), 32, 36 and 191, subd. A of Title 18 of the Louisiana Revised Statutes are suspended insofar as they prescribe tests and devices defined in Section 4(c) of the Voting Rights Act of 1965.

■ (3) The State Courts of Louisiana do not have jurisdiction to enjoin execution of any provision of the Voting Rights Act of 1965. Accordingly, writs of injunction entered by the state courts against the parish registrars of voters are null and void.

(4) The United States and its agents correctly administered the Louisiana age requirement by accepting for registra-

tion persons who would be 21 years old by the date of the next election;

(5) The United States and its agents incorrectly administered the Louisiana residence requirement by listing persons who would be residents of the State for one year, the parish for six months, the municipality for four months, and the precinct for three months by the date of the next election, instead of using the date of the application for listing as the critical date.

(6) In all other respects the United States and its agents properly administered and applied to the State of Louisiana the contested sections of the Voting Rights Act of 1965 and the uncontested provisions of Louisiana law.

It is hereby ordered, adjudged, and decreed that the defendants and their agents, including parish registrars of voters and all parish, municipal and state primary and general election officials and their officers, employees, and successors, and all those in active concert and participation with them, be and hereby are permanently enjoined from:

a. Failing to place upon the official registration rolls or voting lists of the respective parishes the names of all persons heretofore or hereafter certified and transmitted by federal voting examiners as the names of persons eligible to vote;

b. Complying with or giving any force or effect to the writs of injunction entered against the parish registrars of voters or other local election officials by the Louisiana Courts enjoining said officials from giving full force and effect to the lists of eligible voters transmitted to them by the examiners;

c. Failing to provide at the polls during each federal, state, parish, and municipal election held in the State of Louisiana, including all primary elections, assistance to each voter who because of inability to read or write needs assistance in the operation of any mechanical voting device or in marking his ballot so that his vote be properly cast for the candidates and issues of his choice.

It is further ordered that the United States and its agents reexamine the application forms of all persons listed by federal examiners and inform by mail or otherwise those persons who had not resided in the state, parish, precinct, and municipality for the required length of time as of the date of application for listing that they are ineligible to vote. In determining the appropriate action to be taken the United States should employ the following criteria:

(1) Each applicant who has met the State of Louisiana residence qualifications as of the date of this Order, or who otherwise qualifies under the thirty-day provision of Section 16, Article 8 of the Louisiana Constitution, will not be required to reapply and will be considered as registered or listed to vote as of the date upon which he was originally listed.

(2) Each applicant who has not met the State of Louisiana residence qualifications as of the date of this Order and does not otherwise qualify under the thirty-day provision of Section 16, Article 8 of the Louisiana Constitution will be removed from the list of eligible voters and notified of the revocation of his certificate of eligibility, the reasons therefor, and the date upon which he could become eligible to reapply for registration or listing. Such persons should also be notified that they may appear before an examiner to show cause why they should not be reinstated and deemed listed as of the date of the original listing of their names.

A list of the names and addresses of all applicants for listing recontacted and a statement of action taken and the reasons therefor shall be filed by the United States with this court and submitted to the State of Louisiana and the appropriate parish registrars of voters. Persons named on this list and persons reinstated at least five days prior to the next election, unless removed from the eligibility list by the United States pursuant to this Order or later purged in accordance with generally applicable federal and state law, shall be eligible to vote in all

elections for which they are otherwise eligible held in the parish and municipality of their residence.

This court retains jurisdiction of this cause for the purpose of issuing any and all additional orders which may become necessary and appropriate and awards costs to the United States.

WEST, District Judge (concurring in part and dissenting in part).

I concur with the majority opinion on all except two issues involved in this case. As incredible as it may seem, the Congress has, by the Voting Rights Act of 1965, provided for the registration by Federal Registrars in a certain few selected states, of persons who are completely illiterate and who are unable to read, write, or even sign their names. This, despite specific state voting laws to the contrary. And as incredible as it may seem, the United States Supreme Court, in State of South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769, has held this law to be constitutional. Thus, this Court being bound by the Supreme Court pronouncements on this subject, must hold, as the majority opinion does, that the provisions of the Voting Rights Act of 1965 dealing with the registration of voters without the use of a state imposed test or device, must be abided by by the State of Louisiana and its agents. With this conclusion I must agree. But it is my appreciation of the law that only those provisions of state law that are in conflict with the provisions of the Voting Rights Act may be held by this Court to be unenforceable. I must, therefore, respectfully dissent from the majority opinion wherein it enjoins the defendants and their agents, including parish registrars of voters, and all parish, municipal, and state primary and general election officials and their officers, employees, and successors, from "[f]ailing to provide at the polls during each federal, state, parish, and municipal election held in the State of Louisiana, including all primary elections, assistance to each voter who, because of inability to read or write, needs assistance in the operation of any mechanical voting device or in marking his ballot so that his vote be properly cast for the candidates and issues of his choice." This part of the Court's order is in direct conflict with Louisiana laws which have not been shown to be in conflict with the Voting Rights Act. In support of this part of its order, the majority opinion states:

> "In granting the relief prayed for we have ordered election commissioners to give assistance to voters who are unable to read and write. Louisiana now allows and has always allowed illiterates to vote. Until 1960 Louisiana law provided that a voter 'unable to read and write, shall receive the assistance of a commissioner of his own selection in the marking of his ballot'. LSA–R.S. 18:350. In 1960, as one of a bundle of segregation statutes, the Louisiana legislature enacted Act 499 amending Section 350. This amendment provides, in part, 'The inability to read or write shall not entitle a voter to assistance in the casting of his vote'."

This statement by the majority is simply not accurate. Whether or not Louisiana "now allows and has always allowed illiterates to vote" is highly questionable. But there is simply no doubt that the Louisiana Legislature *did not* in 1960, "as one of a bundle of segregation statutes" amend the law to provide that "[t]he inability to read or write shall not entitle a voter to assistance in the casting of his vote." This has been the law of Louisiana for many, many years, and it was not changed by the Louisiana Legislature in 1960. *Act 309 of 1952* specifically provided:

> "The inability to read or write shall not entitle a voter to assistance in the casting of his vote."

This Act of 1952 provided, among other things, for assistance for blind persons or those with physical handicaps, but as noted above, it specifically denied such assistance to those unable to read or write. *Act 499 of 1960,* referred to in the majority opinion as "one of a

bundle of segregation statutes," contains the exact language as found in the *1952* Act, namely: "The inability to read or write shall not entitle a voter to assistance in the casting of his vote."

Prior to the 1960 Act, a blind person, or one with a physical handicap, could call upon a commissioner to assist him in casting his vote. The only change that the 1960 Act made was to provide that such a handicapped person could not select a commissioner to assist him in casting his vote, but could select certain other designated persons to render him such assistance. Thus, it is obvious that the 1960 statute referred to was not "one of a bundle of segregation statutes," nor did it change the long standing law of Louisiana insofar as assistance to illiterates is concerned. Louisiana, by law, has refused such assistance to those unable to read and write at least since 1952, a time which predates the flood of civil rights litigation triggered by Brown, et al. v. Board of Education of Topeka, et al., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, decided in 1954. Indeed, it is highly doubtful that even as far back as 1940, a voter, *because of illiteracy,* was entitled, under Louisiana law, to assistance in actually casting his vote. See Act 46 of 1940. Thus, the disputed provision of Louisiana law can hardly be looked upon as something inspired by the civil rights controversies of the past decade.

There is no provision in the Voting Rights Act for granting such assistance to those unable to read or write, and thus, the disputed provision of Louisiana law is in no way in conflict with any provision of the Voting Rights Act. It must be remembered that we are not talking about a few scattered illiterates. Illiterates by the thousands have now been registered in Louisiana under the provisions of the Voting Rights Act. To require Louisiana officials to grant such assistance to illiterates is tantamount to destroying, in large measure, the secrecy of the ballot contrary to the laws of Louisiana. It also seems to me that the majority's order could be likened to or-

dering a school or university not only to enroll certain designated persons as students, but in addition thereto, to assist those students in the taking of their final examinations. Such an order, I like to believe, would be unthinkable. The avowed purpose of the Voting Rights Act was to eliminate discrimination in the exercise of the franchise. The elimination of the use of tests and devices as a means of testing voter qualifications and the use of Federal Registrars to actually register prospective voters, without regard to state imposed qualifications, has, I believe, accomplished this purpose. It has not been alleged or argued by anyone that I know of that discrimination took place inside the voting booth. The Voting Rights Act was not designed to correct any evils existing inside the voting booth because no such evils have been alleged. I do not believe that this Court has any authority to order that assistance in voting be given to illiterates where no such assistance is provided for by the Voting Rights Act, and where no such assistance is required to eliminate the type of discrimination dealt with by the Voting Rights Act. I must, therefore, dissent from the majority opinion which orders the giving of such assistance to those unable to read or write.

I must also respectfully dissent from the majority opinion insofar as it concludes that the defendants did not prove that the United States and its agents failed to observe the Louisiana statutory requirements as to identification of voter applicants. I agree with the majority in its conclusion that the provisions of Louisiana law, providing for the identification of applicants for registration are not in conflict with the Voting Rights Act. However, on the hearing of this case, Mr. Bruce Rhiddlehoover, the Federal Examiner in the Parish of Plaquemines, specifically testified that he did not require any identification of applicants except from those who could not spell their name or could not pronounce their name so that he could understand it. Also, Mr. Luke Petrovich, who served

on the Commission Council in Plaquemines Parish, Louisiana, also testified that the Federal Examiners did not obtain sufficient information by which the prospective voters could be identified. For this reason, I cannot agree with the majority when it says that the defendants failed to prove that the Federal Examiners did not observe the Louisiana statutory requirements as to identification of applicants.

## ORDER

WISDOM, Circuit Judge.

The following telegram sent to:

THE HONORABLE JACK P. F. GREMILLION, ATTORNEY GENERAL OF LOUISIANA, CAPITAL BLDG. BATON ROUGE, LOUISIANA—INFO MR. HUBERT BANTA CHIEF DEPUTY MARSHAL U. S. DISTRICT COURT, P. O. BLDG., BATON ROUGE, LA.

Upon receiving your telegram the court conferred by telephone. The court, with Judge West dissenting, denies your request for a stay. In view of this decision, the court is unanimously of the opinion that no good purpose would be served by a hearing on your request for a stay. In accordance, however, with your request for a clarification of the order, the court has amended its order by adding the following paragraph: QUOTE "Assistance to voters because of their inability to read or write shall be rendered in both primary and general elections. The assistance shall be rendered substantially in the same manner and under the same conditions as such assistance was rendered when aid to illiterate voters was permitted under the laws of Louisiana, bearing in mind changes in the method of voting incident to the use of voting machines. See LSA–R.S. 18:350. A voter who declares to a commissioner that he is unable to read or write, shall receive the assistance of a commissioner of his own selection in the casting of his ballot. The Commissioner shall ascertain the wishes of the voter and cast the assisted voter's ballot accordingly. A commissioner shall first, however, require the voter to make a declaration of inability under oath. No person shall swear falsely in order to obtain assistance. Whenever a voter receives assistance, the commissioners in charge of the poll lists shall write the voter's name in the list and shall write in the column of remarks on the poll list opposite the name of the voter the words 'assisted and sworn.' No voter shall ask for or receive assistance from an unauthorized person. No person who is not a commissioner shall volunteer to assist a voter in physically casting his ballot. When a voter calls a commissioner to assist in casting his ballot, one other commissioner, if any, supporting a candidate opposing the elector's preferred candidate, shall enter the polling booth and view the casting of the ballot, but no other person except commissioners shall give assistance nor shall any person other than a commissioner at any time enter a polling booth while another voter is in the booth. No commissioner shall make known the way an assisted voter casts his ballot, or cast the ballot contrary to the instructions of the voter. Nothing in this order affects assistance to blind or physically disabled voters." UNQUOTE Sincerely—John Minor Wisdom, U. S. Circuit Judge—Judge Herbert W. Christenberry, U. S. District Judge, New Orleans, La.

WEST, District Judge, dissents for reasons previously stated.

## ORDER OF CLARIFICATION

PER CURIAM.

The plaintiff having applied for a clarification of this court's Order of August 10, 1966, as amended on August 11, 1966, a hearing having been held on August 12, 1966, on said application before Honorable John Minor Wisdom and Honorable Herbert W. Christenberry, and the defendants, represented by counsel, having appeared and objected to the application,

It is hereby ordered, adjudged, and decreed that the defendants and their agents, including parish registrars of

voters and all parish, municipal and state primary and general election officials and their officers, employees, and successors, and all those in active concert and participation with them, be and hereby are enjoined from:

a. Interfering with any federal observers, duly appointed under the provisions of Section 8 of the Voting Rights Act of 1965, so as to prevent such observer from exercising any of the powers or performing any of the duties vested in him by Sections 8 and 14 of the Voting Rights Act of 1965 to observe whether persons who are entitled to vote are being permitted to vote at precinct polling places designated pursuant to Section 6 of the Voting Rights Act of 1965, namely East Feliciana, West Feliciana, Ouachita, East Carroll, Madison and Plaquemines.

b. Preventing such federal observers from being present within the voting place during the election to be held on August 13, 1966.

c. Preventing such federal observers from observing the assistance provided to illiterate voters requiring assistance; provided however that an observer may not go behind the curtains of the voting machine, while the assisted voter is in the booth, unless requested to do so by the illiterate voter. If the illiterate voter makes such request, the voting commissioners shall allow the observer to go behind the curtains but solely for purposes of observing. The observer shall be under the same duty to preserve the secrecy of the ballot as are the commissioners.

## SECOND ORDER OF CLARIFICATION

The parties to this action have requested that the Court modify and clarify its orders of August 10, 11, and 12, 1966.

## I.

The defendants contend that additional identifying data for federally listed voters should be available to local election officials.

Congress did not intend that the federal listing procedure should conform to that of the state. Section 7(a) provides:

* * * An application to an examiner shall be in such form as the Commission (Civil Service Commission) may require * * *.

Section 9(b) additionally provides:

The times, places, procedures, and form for application and listing pursuant to this act * * * shall be prescribed by regulations promulgated by the Civil Service Commission * * *.

The report of the House Committee on the Judiciary contained the following explanation of the state laws to be applied:

While State law prescribing qualifications is to govern, this means only State law not inconsistent with Federal law, including this act. State laws regulating the procedures for registration for voting need not be followed by Federal examiners.

The informational data the defendants contend is needed are not voting "qualifications". An applicant need not have any particular eye color or employer in order to "qualify" to register.

The Eligibility Lists of federally registered voters are sent to each parish registrar and they contain the following descriptive information—name, address, certificate of eligibility number, date of application, age of the applicant, ward and precinct. The certificate of eligibility to vote, which the applicant is given, contains a number (these certificates are numbered consecutively) and lists the name, address, state, parish, ward, precinct, and date of application of the voter. The certificate also has on it the signature of the applicant (which must be affixed in the presence of the federal

examiner) and has on it the signature of the examiner.

Thus, when a person presents himself at the polls, the commissioner may check the number and name on his certificate to see if it corresponds to the number and name certified on the eligibility lists. He may check to make sure that address, precinct, ward and date of application correspond properly from the certificate to the list. He may require the applicant to sign his name and compare his signature to the signature on the certificate. If he is still not satisfied, he may ask the applicant his age and look at the applicant to see if he is likely to be younger or older than the age which the examiner has certified him to be. (The voter's age is *not* contained on the certificate but is contained on the eligibility lists, so that an applicant asked his age would not have before him the answer to that question, and could not know the answer unless he is the person he represents himself to be.)

If the applicant does not have his certificate and there is some doubt about his identity he may obtain a duplicate at the Office of the Federal Examiner which is open on the day of every election and for 48 hours thereafter.

We agree with the position of the United States that federally listed persons should not be required to do anything further to establish their right to vote. The United States, however, has stated that it is willing to furnish to the election officials copies of the executed applications used by the Civil Service Commission in listing persons under the Act. These will be arranged by precinct and delivered before the run-off primary September 24, 1966. The use of these forms together with the certificates of eligibility and the normal knowledge of the commissioners of election of the persons who live in their community will, in our view, go far toward meeting the identification questions posed by the State at the argument.

The United States has also offered to review the forms now used by the Civil Service Commission, and, applying the experience gained in the two primaries and the general election in Louisiana and the elections in other states covered by the Act, to advise the Court by December 1, 1966, of any revisions it believes should be made.

The Court approves the suggested offer of the United States. Accordingly, at this time, no change in its orders is necessary with respect to identification at the polls of federally listed voters.

II.

The defendants request that the Court modify its orders to do away with any assistance to illiterate voters. In its opinion of August 10, 1966, this Court said:

Like any other law, this [test suspension] provision implicitly carries with it all means necessary and proper to carry out effectively the purposes of the law. * * * We cannot impute to Congress the self-defeating notion that an illiterate has the right to pull the lever of a voting machine, but not the right to know for whom he pulls the lever.

This construction of the Act agrees with that of the unanimous three-judge court in United States v. State of Mississippi (S.D.Miss., 256 F.Supp. 344, opinion dated May 21, 1966; Circuit Judge Brown and District Judges Clayton and Cox). Although Mississippi law at the time of that decision made no provision for assistance to illiterates, the court stated (at p. 348):

We agree that the obvious sense of Congress is to assure not just registration but the full exercise of the right to vote itself. Indeed, the Act defines "vote" or "voting" in terms of any and "all action necessary to make a vote effective in any * * * election * * * [including] * * * casting a ballot * * *." § 14(c). We think some suitable arrangements must be made to afford this assistance; and there are ample resources under the Act to effectuate it. Cf. § 5; § 12(d).

The same result was reached by federal courts sitting in Alabama and South Carolina. See Judge Thomas's order in

United States v. Executive Committee of Democratic Party of Greene County, Alabama, D.C.1966, 254 F.Supp. 543 and Judge Martin's order in United States v. The County Executive Committee of the Democratic Party of Clarendon County, South Carolina, (D.C.S.Car. C.A. No. 66–459), decided June 1966.

Present Louisiana law, as interpreted by the State Attorney General, permits the giving of assistance by poll commissioners to illiterates at general elections. See L.R.S. 18:732, 18:1185; Opinions of the Attorney General, February 5, 1964; Opinions of the Attorney General, 1960–62, p. 97. This Court's order of August 11, 1966, followed the precise language of L.R.S. 18:350, as it read before its amendment in 1952, in prescribing the procedure to be followed in rendering assistance to illiterates at both primary and general elections.

There are varying degrees of illiteracy, and varying degrees of voter intelligence among functionally illiterate electors. Many illiterates are able to respond to symbols and numbers; others will memorize the positions on the ballot of those for whom they wish to vote. Still others, even if unable to do these things, are willing to take their chances rather than reveal their choices to polling officials. Nonetheless, those few voters who do not trust their own ability to cast a ballot effectively and are willing to seek assistance are, under the Voting Rights Act of 1965 as we read it, entitled to that assistance.

Contrary to the understanding of some persons, the federal observers observe; they do not render assistance to illiterates.

 The United States calls our attention to the need for clarifying the duty of election commissioners to advise a person requiring assistance that he may, if he desires, have a federal observer go behind the curtain with him. Accordingly, paragraph c of the Order of Clarification is amended by the addition of the following language:

The voting commissioners shall advise each person receiving assistance in casting his vote that federal observers are present to observe the act of voting, by machine or otherwise, and that he may, if he desires, have such an observer go behind the curtain to observe the marking and casting of his ballot by machine or otherwise.

Paragraph c will then read:

Preventing such federal observers from observing the assistance provided to illiterate voters requiring assistance; provided however that an observer may not go behind the curtains of the voting machine, while the assisted voter is in the booth, unless requested to do so by the illiterate voter. The voting commissioners shall advise each person receiving assistance in casting his vote that federal observers are present to observe the act of voting, by machine or otherwise, and that he may, if he desires, have such an observer go behind the curtain to observe the marking and casting of his ballot by machine or otherwise. If the illiterate voter makes such request, the voting commissioners shall allow the observer to go behind the curtains but solely for purposes of observing. The observer shall be under the same duty to preserve the secrecy of the ballot as are the commissioners.

### III.

 A suggestion was made at the hearing that the Court order observers not to be sent to certain parishes. The Court does not have such jurisdiction. Under Section 8 of the Voting Rights Act of 1965, 42 U.S.C. § 1973f, the appointment of observers is a matter of executive discretion and is not subject to judicial review. 42 U.S.C. § 1973f; United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259.

Except as modified herein the previous orders are reaffirmed.

WEST, District Judge (dissenting):

I must respectfully dissent from the majority decision in this case to force

the State of Louisiana to provide assistance to illiterates in the voting booth, in the actual casting of their votes, and to force the State of Louisiana to permit Federal observers to go into the voting booth with an illiterate voter and watch him vote because I sincerely believe they are wrong—dead wrong.

The Voting Rights Act of 1965 simply does not provide for such assistance, nor does it in any way authorize a Federal observer to watch a person cast his vote. Section 8 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973f provides:

"Whenever an examiner is serving under this Act in any political subdivision, the Civil Service Commission may assign, at the request of the Attorney General, one or more persons, who may be officers of the United States, (1) to enter and attend at any place for holding an election in such subdivision *for the purpose of observing whether persons who are entitled to vote are being permitted to vote,* and

(2) to enter and attend at any place for tabulating the votes cast at any election held in such subdivision *for the purpose of observing whether votes cast by persons entitled to vote are being properly tabulated.* Such persons so assigned shall report to an examiner appointed for such political subdivision, to the Attorney General, and if the appointment of examiners has been authorized pursuant to section 3(a), to the court." (Emphasis added.)

Thus, the function of the Federal observer is clearly defined, i. e., to observe whether persons who are entitled to vote are being permitted to vote and to observe whether votes cast by persons entitled to vote are being properly tabulated. By the express terms of the Act, the observers are allowed to enter only the "place for holding an election" and the "place for tabulating the votes cast." They are not authorized under any circumstances by this Act to enter the voting booth itself, nor to go behind the curtain of a voting machine, while a person is casting his vote.

Section 14(c) (1), 42 U.S.C.A. § 1973*l* (c) (1) provides:

"The terms 'vote' or 'voting' shall include all action necessary to make a vote effective * * * including * * * casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast * * *."

Thus, when a person, whether literate or illiterate, is properly registered to vote, without discrimination, and then permitted, without hindrance or discrimination, to enter the voting booth and cast his vote as he sees fit, and when his vote, however cast, is included in the totals of votes cast, he has been allowed to "effectively" cast his vote. He is entitled to no more, and the Voting Rights Act guarantees him no more. The illiterate voter is no more entitled under the Voting Rights Act to assistance *within the voting booth* than is the literate voter who might like some last minute assistance in making up his mind for whom to vote. The majority order in this case inserts into the Voting Rights Act that which Congress did not see fit to include. This Court has no authority whatsoever to so enlarge the provisions of the Act. At the risk of the suggestion being taken seriously, I must point out that if it is proper for this Court to order the State of Louisiana to furnish such assistance to illiterate voters who have been registered under the Act in order to make their vote "effective", then it might also be considered in order for the Court, if requested to do so, to order the State of Louisiana to furnish transportation to the polls for those illiterates who have been registered to vote under the Act but who, because of their inability to read the newspaper, are unable to determine where their voting place is located. For how can their vote be "effective" under the majority's interpretation of the word, if they cannot, without assistance, get to the voting place, and if such assistance is denied?

If the illiterate voter is entitled to such assistance inside the voting booth, why

should not the literate voter be entitled to have a commissioner go inside the voting booth with him if he so desires to explain what some thirty or forty constitutional amendments are all about so that he may "effectively" cast his vote. The answer is simple. Such assistance is not necessary in order to make one's vote "effective." A person's vote is "effective" when cast, even though he may have voted for the wrong candidate. It is effective simply because, when counted, it adds one more vote to the total received by the candidate for whom he voted.

The Voting Rights Act was ostensibly intended by Congress to eliminate what it believed to be discrimination practiced in certain localities whereby certain elements of the population, even though qualified, were not allowed to register or to vote. No one can successfully argue against this noble purpose. To prohibit qualified persons from voting is both undemocratic and reprehensible. But in its zeal to protect the rights of qualified voters, Congress enacted the Voting Rights Act of 1965 which, despite United States Supreme Court pronouncements to the contrary, I sincerely believe to be totally and completely unconstitutional. I believe that it is unconstitutional even when its operation is confined to the provisions contained therein. But when, as done here by the majority of this Court, its ambit is extended to include areas clearly beyond anything intended or provided by Congress in the Act, its unconstitutionality is not only apparent but it is glaring. This Court is, of course, bound by the pronouncements of the United States Supreme Court. But it has no right whatsoever to usurp the power of Congress to legislate, and that is exactly what I believe it has done in this instance.

State law in Louisiana specifically denies assistance to illiterate voters in casting their ballot. This is not in conflict with the clear provisions of the Voting Rights Act, and thus there is no occasion to invoke the Supremacy Clause of the United States Constitution. The Voting Rights Act only nullifies such State laws as are in conflict therewith, and since the Voting Rights Act does not provide for assistance to illiterates inside the voting booth, the State law specifically denying such assistance is not in conflict with Federal law. Louisiana employs the system of identifying all candidates and issues on the voting machine by assigning numbers thereto. This is for the express purpose of making it possible for voters to acquaint themselves with numbers rather than with names and thus simplifying the voting process. These numbers are widely publicized by candidates and newspapers and all other news media and all voters are urged to vote by number. Even the most illiterate voter may determine ahead of time the numbers of the candidates for whom he wishes to vote and bring a sample ballot with him into the voting booth, and thus eliminate the need for assistance inside of the voting booth. The right of illiterates to have assistance in the actual casting of their ballot was specifically eliminated by the State of Louisiana in 1952 as a part of a reform movement to eliminate crooked elections. It has worked, and it should be allowed to continue to work. The position taken by the majority of the Court in this case sets the State of Louisiana back fourteen years and once again opens the door to fraudulent elections, to say nothing of the fact that it puts the long-cherished secrecy of the ballot in serious jeopardy. The Voting Rights Act of 1965, in my opinion, constitutes invidious discrimination against the six or seven states affected by its provisions, and the order of this Court adds materially to that discrimination. And even if it were conceded that the Voting Rights Act requires such assistance to illiterate voters, as the majority of this Court has decreed, it then necessarily follows that such a requirement must result in the most invidious kind of discrimination against the illiterate voters in all of the forty-three or forty-four states not affected by the Voting Rights Act who may not, under the laws of their particular state, be en-

titled to such assistance. And, if it is necessary, in order to make the vote of an illiterate "effective", to have a Federal observer watch him vote, then the order of this Court is obviously discriminatory because it only authorizes observers in the six parishes wherein Federal examiners are located, thus, apparently making the vote of illiterates in the remaining fifty-seven parishes of the State "ineffective" because of the absence of Federal observers. There is simply no way to square this type of discrimination with the Due Process Clause and the Equal Protection Clause of the United States Constitution, to say nothing of its obvious conflict with the Tenth Amendment. I must, for these reasons, respectfully dissent from the opinion of the majority in this case.