Mrs. Fannie Lou **HAMER** et al., Appellants,

v.

**Sam J. ELY, Jr., et al., Appellees.**

No. 25610.

United States Court of Appeals
Fifth Circuit.

April 10, 1969.

---

Benjamin E. Smith, New Orleans, La., Morton Stavis, Dennis J. Roberts, George Logan, III, Harriet Van Tassel, Newark, N. J., Alvin J. Bronstein, L. H. Rosenthal, Jackson, Miss., William M. Kunstler, Arthur Kinoy, New York City, for appellants; Irving M. King, Cotton, Watt, Jones & King, Chicago, Ill., of counsel.

W. Dean Belk, Jr., Indianola, Miss., Joe T. Patterson, Atty. Gen., Will S. Wells, Asst. Atty. Gen., Jackson, Miss., for appellees.

Before WISDOM, THORNBERRY, and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

May 2, 1967, was a historic day in the Town of Sunflower, Mississippi. That day there was an election to choose a mayor and five aldermen.[1] For most of the Negro electors, it was the first time in their lives that they could cast a ballot. Moreover, the Negroes, constituting a majority of the 900 residents of Sunflower, had a black candidate for mayor and six black candidates for the five aldermanic positions that were to be filled. The list of registered voters showed 190 Negro registrants and 160 white registrants.

The candidates campaigned vigorously. Negro leaders extended themselves to educate the voters, many of whom were illiterate, and to explain the mechanics of voting. Came election day. Sunflower overflowed with strangers. These were reporters, representing the wire services and newspapers, and broadcasters and cameramen, some of whom represented national television networks. The wires to Washington had hummed before the election. Three federal observers were present inside the polling place. A federal "team captain" came to the polling booth from time to time during the day. Two attorneys from the Department of Justice were on hand.

To the chagrin of the hardworking Negro campaigners, their candidate for mayor lost by a vote of 190 to 121. The five white candidates for aldermen won by votes of 180, 165, 165, 161, and 160 to 111, 105, 105, 104, 77, and 32.

It is easy to understand the feeling of the Negro candidates and their supporters. They felt that there must have been skullduggery at the polls. Indeed, with reason, they could and did say that the Board of Election Commissioners should have shown more consideration for the uninformed, often illiterate, Negro casting his first ballot. In a motion asking the district court to set aside the election, the plaintiffs focused their attack on the Election Commission's refusal to permit illiterate Negro voters to have voting

1. The election was held under order of the district court issued in accordance with this Court's decision in Hamer v. Campbell, 5 Cir. 1966, 358 F.2d 215, cert. den. 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79. In that case we concluded that the district court should have enjoined the 1965 election; we ordered that the election be set aside and a new one held under a plan to be directed by the district court.

assistance from Negro election officials. After a hearing, the district judge found that the election "was conducted in a completely fair, objective way and that the results thereof truly represent the will of a majority who voted that day". On the record as a whole, we cannot say that the district court erred.

## I.

The campaign manager for the Negro candidate for mayor and for five of the six Negro candidates for aldermen was Mr. Joseph Harris. He was not a registered voter in Sunflower but he was an employee of the Delta Ministry of the National Council of Churches who had been active for several years in encouraging Negroes in the Delta to register. In preparing for the election, Mr. Harris conducted a survey to determine the number of Negro voters who would need assistance in marking their ballots. Based on this survey and a practice election, he concluded that over one-third of the Negro voters would need assistance at the polls. Attorneys for the plaintiffs discussed this key problem with Mr. Will Wells, counsel for the defendants and an Assistant Attorney General for the State of Mississippi, and arrived at an "understanding". Mr. Wells testified:

> That sometime in the latter part of April, prior to the election in May, that I conferred with Mr. Stavis, at the Attorney General's office in Jackson, discussing the coming election, and I did advise him at that time that it was my understanding, based on conversations which I had had with Mr. Oscar Townsend, who is attorney for the Town of Sunflower, that there would be two Negro men who would be appointed as election officials, clerks, for the holding of that election, and that I further understood that one of them was Joseph Harris;

> That it was further my understanding, based on my conversations, that in the matter of aiding and assisting illiterates, that those two Negro men would be authorized to assist any illiterate who requested that they aid them in casting their ballots;

> That on the day before the election * * * it was still at that time my understanding that that would be the procedure.

On the evening of May 1, while the Negroes in Sunflower were being assured at a meeting that they would receive voting assistance, the Board of Election Commissioners held a meeting. General Wells urged the Commissioners to allow Negro voting officials to assist Negro voters. The Board of Commissioners, however, decided that only members of the Commission were permitted to render aid to illiterate voters. In addition, there is some indication that the Commission considered that Mr. Harris, both because he was not a registered voter in Sunflower and because he was Campaign Manager of six of the seven Negro candidates, would be an inappropriate choice for an election official. All three commissioners are white. To make matters worse, so the plaintiffs say, one of the commissioners is "a plantation owner" who was running for County Sheriff; he had been a deputy sheriff; and his brother was a candidate for alderman in the May 2 election. Another commissioner operates a grocery store where Negroes frequently purchase goods on credit.

The Commission did appoint two Negroes to serve as election officials but they were assigned only ministerial functions. Mr. Harris inscribed the names of the voters in a book. The other Negro official stood near the ballot box and placed ballots in the box as they were handed to him by the voters.

The plaintiffs contend that many illiterate Negro voters cast their ballots without aid, rather than disclose how they voted. In support of this contention they point to the fact that there were 27 rejected irregular ballots. The plaintiffs assume that these ballots were all cast by Negroes. This is not necessarily

true. In Bell v. Southwell, 5 Cir. 1967, 376 F.2d 659, 662, in setting aside an election, we pointed out:

" * * * the trial Court legally could not assume—as it evidently did—that all white voters would vote for white candidates, all Negroes for Negroes, or that no whites would vote for Negroes in a free, untainted election."

An analysis of the rejected and assisted ballots is inconclusive. On election night 38 ballots were marked "irregular", exclusive of 31 ballots marked "assisted". The Commission accepted 11 of the irregular ballots. Of these, eight had votes for Negro candidates only; two split the votes between Negro and white candidates; one had votes for white candidates only. Of the 27 rejected ballots, 14 had votes for Negro candidates only; 11 split the votes; two had votes for white candidates only. In the race for mayor, an analysis of the 31 assisted ballots shows that 12 votes were cast for the white candidate and 19 for the Negro candidate. In the race for aldermen, of the assisted ballots four were for all white candidates; eight were split; 19 were for all Negro candidates.

The district judge noted: "It is significant that not one witness was offered, not one witness testified that he or she was illiterate and needed assistance in casting his ballot, but refused to ask for assistance because he did not want a white person to know how his vote was cast." Of course, it would be naive to doubt that there must have been some Negroes who were unwilling to ask for aid because of a reluctance to disclose or fear of disclosing how they intended to vote. But this election was held in a fishbowl. The report of the federal observers is in the record. Commenting on the report the district judge said:

"It speaks clearly and demonstrates that this election was fairly and properly held in every respect, and it is not questioned but that every person who was given assistance was assisted fairly and impartially with the ballot

in each instance being marked in exact accord with the voter's wishes."

## II.

The larger issue is whether the refusal of the Election Commissioners to appoint two Negro officials to render voting aid was a failure to provide "adequate assistance" to illiterates as required by a proper construction of Voting Rights Act of 1965.

This requirement of voter assistance stems from the Voting Rights Act, specifically 42 U.S.C.A. § 1973*l*(c) (1) which defines the terms "vote" and "voting" as including "all action necessary to make a vote effective * * *." As the three-judge court said in United States v. State of Louisiana, E.D.La. 1966, 265 F.Supp. 703, 708, aff'd 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed.2d 39:

"We cannot impute to Congress the self-defeating notion that an illiterate has the right [to] pull the lever of a voting machine, but not the right to know for whom he pulls the lever."

In light of this requirement, it becomes " * * * the duty and responsibility of the precinct officials at each election to provide to each illiterate voter who may request it such reasonable assistance as may be necessary to permit such voter to cast his ballot in accordance with the voter's own decision." United States v. State of Mississippi, S.D.Mississippi 1966, 256 F. Supp. 344, 349.

The appellants' position, then, is that the use of only white poll assisters was not "reasonable assistance" in the circumstances prevailing at the Sunflower election.

The Sunflower election was governed by the Declaratory Judgment entered in the case of United States v. State of Mississippi, *supra,* and not by any Mississippi statute. The Mississippi statute dealing with poll assistance was repealed in 1965. This statute provided:

"§ 3273. Illiterate voter to have aid.

A voter who declares to the managers of the election that by reason of inability to read he is unable to mark his ballot, if the same be true, shall, upon request, have the assistance of a manager in the marking thereof; and the managers shall designate one of their number for the purpose, who shall note on the back of the ballot that it was marked by his assistance; but he shall not otherwise give information in regard to the same."

The action of the Sunflower Election Commissioners, however, was in compliance with the statute as it stood before its repeal. In light of the order in United States v. State of Louisiana, *supra*, which was tailored to the precise terms of a *repealed* Louisiana voter assistance statute, the action of the Election Commissioners in the present case, tailored to the terms of a repealed Mississippi statute, would appear to be reasonable.

Voters may be motivated by reasons other than fear for not seeking voter assistance, and they have at their disposal a variety of measures to cast their votes without it. Thus, in United States v. State of Louisiana, E.D.Louisiana, 265 F.Supp. 703, 715, the court said:

There are varying degrees of illiteracy, and varying degrees of voter intelligence among functionally illiterate electors. Many illiterates are able to respond to symbols and numbers; others will memorize the positions on the ballot of those for whom they wish to vote. Still others, even if unable to do these things, are willing to take their chances rather than reveal their choices to polling officials. Nonetheless, those few voters who do not trust their own ability to cast a ballot effectively and are willing to seek assistance are, under the Voting Rights Act of 1965 as we read it, entitled to that assistance."

■ The Act requires that voters be apprised of their right to assistance, not that they be induced to accept it. In the Sunflower election, voters were apprised of their right and each was informed that he could request a federal observer to be with him in the voting booth to check the quality of assistance rendered by the election official.

■ On the cold record before us, the attitude of Sunflower's Election Commissioners may have been shoddy, but it does not justify the "drastic, if not staggering" procedure (Bell v. Southwell, 5 Cir. 1967, 376 F.2d 659) of a federal court's voiding a state election. Such "drastic" measures are properly reserved for cases involving serious violations of voting rights. Hamer v. Campbell, *supra;* McGill v. Ryals, M.D.Alabama, 253 F.Supp. 374.

### III.

■ The plaintiffs also charged that the Election Commissioners used segregated voting lines by giving preference to individual white voters over Negro voters standing in line. The evidence is conflicting. Two witnesses for the plaintiffs testified that while Negroes were waiting in line, whites were admitted to the polling place without any wait at all. A witness for the defendants, employed as bailiff during the Sunflower election, denied the existence of segregated voting lines. He testified that on one occasion he did escort a white voter into the polling place ahead of some Negroes, but that was because the individual concerned was a newspaperman and not a voter. This witness admitted that on two other occasions he had escorted white voters into the polling place, but he insisted that he received permission to do so from the voters in line. One of these preferred voters was a nurse said to be urgently needed; two were a salesman and his wife who worked out of town. The district court concluded that the claim of segregated voting lines was "not sustained by the evidence." The court noted the absence of any testimony to this effect by the federal observers or members of the news media, and the further fact that of 190 Negroes in Sun-

flower eligible to vote in the May 2 election, more than 180 participated.

\*       \*       \*

Taking the record, as a whole, we cannot say that the findings of the district court were clearly erroneous.

The judgment is affirmed.