# Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations

Statutory authority for an agency to incur obligations in advance of appropriations need not be express, but may be implied from the specific duties that have been imposed upon, or of authorities that have been invested in, the agency.

The "authorized by law" exception in the Antideficiency Act exempts from that Act's general prohibition not only those obligations for which there is statutory authority, but also those obligations necessarily incident to initiatives undertaken within the President's constitutional powers.

A government agency may employ personal services in advance of appropriations only when there is a reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property, and when there is some reasonable likelihood that either or both would be compromised in some degree by delay in the performance of the function in question.

January 16, 1981

THE PRESIDENT
        THE WHITE HOUSE

MY DEAR MR. PRESIDENT: You have asked my opinion concerning the scope of currently existing legal and constitutional authorities for the continuance of government functions during a temporary lapse in appropriations, such as the government sustained on October 1, 1980. As you know, some initial determination concerning the extent of these authorities had to be made in the waning hours of the last fiscal year in order to avoid extreme administrative confusion that might have arisen from Congress' failure timely to enact 11 of the 13 anticipated regular appropriations bills,[1] or a continuing resolution to cover the hiatus between regular appropriations. The resulting guidance, which I approved, appeared in a memorandum that the Director of the Office of Management and Budget circulated to the heads of all departments and agencies on September 30, 1980. Your request, in effect, is for a close and more precise analysis of the issues raised by the September 30 memorandum.

Before proceeding with my analysis, I think it useful to place this opinion in the context of my April 25, 1980, opinion to you concerning the applicability of the Antideficiency Act, 31 U.S.C. § 665, upon lapses

---

[1] Prior to October 1, 1980, Congress had passed regular appropriations for fiscal year 1981 only for energy and water development, Pub. L. No. 96–367, 94 Stat 1331 (Oct. 1, 1980).

1

in appropriations, 43 Op. Att'y Gen. No. 24, 4 Op. O.L.C. 16 (1980). That opinion set forth two essential conclusions. First, if, after the expiration of an agency's appropriations, Congress has enacted no appropriation for the immediately subsequent period, the agency may make no contracts and obligate no further funds except as authorized by law. Second, because no statute generally permits federal agencies to incur obligations without appropriations for the pay of employees, agenices are not, in general, authorized by law to employ the services of their employees upon a lapse in appropriations. My interpretation of the Antideficiency Act in this regard is based on its plain language, its history, and its manifest purposes.

The events prompting your request for my earlier opinion included the prospect that the then-existing temporary appropriations measure for the Federal Trade Commission (FTC) would expire in April, 1980, without extension, and that the FTC might consequently be left without appropriations for a significant period.[2] The FTC did not then suggest that it possesses obligational authorities that are free from a one-year time limitation. Neither did it suggest, based on its interpretation of the law at that time, that the FTC performs emergency functions involving the safety of human life or the protection of property other than protecting government property within the administrative control of the FTC itself. Consequently, the legal questions that the April 25, 1980, opinion addressed were limited. Upon determining that the blanket prohibition expressed in § 665(a) against unauthorized obligations in advance of appropriations is to be applied as written, the opinion added only that the Antideficiency Act does permit agencies that are ceasing their functions to fulfill certain legal obligations connected with the orderly termination of agency operations.[3] The opinion did not consider the more complex legal questions posed by a general congressional failure to enact timely appropriations, or the proper course of action to be followed when no prolonged lapse in appropriations in such a situation is anticipated.

The following analysis is directed to those issues. Under the terms of the Antideficiency Act, the authorities upon which the government may rely for the continuance of functions despite a lapse in appropriations implicates two fundamental questions. Because the proscription of § 665(a) excepts obligations in advance of appropriations that are "authorized by law," it is first necessary to consider which functions this exception comprises. Further, given that § 665(b) expressly permits the

---

[2] FTC actually sustained less than a one-day lapse in appropriations between the expiration, on April 30, 1980, of a transfer of funds for its use, Pub. L No. 96–219, 94 Stat. 128 (Mar. 28, 1980), and the enactment, on May 1, 1980, of an additional transfer, Pub. L. No. 96–240, 94 Stat. 342. Prior to April 30, however, it appeared likely that a protracted congressional dispute concerning the terms of the FTC's eventual authorization, Pub. L. No. 96–252, 94 Stat. 374 (May 28, 1980), would precipitate a lapse in appropriations for a significantly longer period.

[3] *See* note 11, *infra.*

government to employ the personal service of its employees in "cases of emergency involving the safety of human life or the protection of property," it is necessary to determine how this category is to be construed. I shall address these questions in turn, bearing in mind that the most useful advice concerning them must be cast chiefly in the form of general principles. The precise application of these principles must, in each case, be determined in light of all the circumstances surrounding a particular lapse in appropriations.

## I.

Section 665(a) of Title 31, United States Code provides:

> No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropiation or fund in excess of the amount available therein; *nor shall any officer or employee involve the Government in any contract or obligation, for the payment of money for any purpose, unless such contract or obligation is authorized by law.* (Emphasis added.)

Under the language of § 665(a) emphasized above, it follows that, when an agency's regular appropriation lapses, that agency may not enter contracts or create other obligations unless the agency has legal authority to incur obligations in advance of appropriations. Such authority, in some form, is not uncommon in the government. For example, notwithstanding the lapse of regular appropriations, an agency may continue to have available to it particular funds that are subject to a multi-year or no-year appropriation. A lapse in authority to spend funds under a one-year appropriation would not affect such other authorities. 13 Op. Att'y Gen. 288, 291 (1870).

A more complex problem of interpretation, however, may be presented with respect to obligational authorities that are not manifested in appropriations acts. In a few cases, Congress has expressly authorized agencies to incur obligations without regard to available appropriations.[4] More often, it is necessary to inquire under what circumstances statutes that vest particular functions in government agencies imply authority to create obligations for the accomplishment of those functions despite the lack of current appropriations. This, of course, would be the relevant legal inquiry even if Congress had not enacted the Antideficiency Act; the second phrase of § 665(a) clearly does no more than codify what, in any event and not merely during lapses in appropriations, is a requirement of legal authority for the obligation of public funds.[5]

---

[4] *See, e.g.,* 25 U.S.C. § 99; 31 U S.C. § 668; 41 U.S.C. § 11.

[5] This rule has, in fact, been expressly enacted in some form for 160 of the 191 years since Congress first convened. The Act of May 1, 1820, provided:

[N]o contract shall hereafter be made by the Secretary of State, or of the Treasury, or

Continued

Previous Attorneys General and the Comptrollers General have had frequent occasion to address, directly or indirectly, the question of implied authority. Whether the broader language of all of their opinions is reconcilable may be doubted, but the conclusions of the relevant opinions fully establish the premise upon which my April 25, 1980, memorandum to you was based: statutory authority to incur obligations in advance of appropriations may be implied as well as express, but may not ordinarily be inferred, in the absence of appropriations, from the kind of broad, categorical authority, standing alone, that often appears, for example, in the organic statutes of government agencies. The authority must be necessarily inferrable from the specific terms of those duties that have been imposed upon, or of those authorities that have been invested in, the officers or employees purporting to obligate funds on behalf of the United States. 15 Op. Att'y Gen. 235, 240 (1877).

Thus, for example, when Congress specifically authorizes contracts to be entered into for the accomplishment of a particular purpose, the delegated officer may negotiate such contracts even before Congress appropriates all the funds necessary for their fulfillment. *E.g.,* 30 Op. Att'y Gen. 332, 333 (1915); 30 Op. Att'y Gen. 186, 193 (1913); 28 Op. Att'y Gen. 466, 469–70 (1910); 25 Op. Att'y Gen. 557, 563 (1906). On the other hand, when authority for the performance of a specific function rests on a particular appropriation that proves inadequate to the fulfillment of its purpose, the responsible officer is not authorized to obligate further funds for that purpose in the absence of additional appropriations. 21 Op. Att'y Gen. 244, 248–50 (1895); 15 Op. Att'y Gen. 235, 240 (1877); 9 Op. Att'y Gen. 18, 19 (1857); 4 Op. Att'y Gen. 600, 601–02 (1847); *accord,* 28 Comp. Gen. 163, 165–66 (1948).

This rule prevails even though the obligation of funds that the official contemplates may be a reasonable means for fulfilling general responsi-

of the Department of War, or of the Navy, except under a law authorizing the same, or under an appropriation adequate to its fulfillment.

3 Stat. 567, 568. The Act of March 2, 1861, extended the rule as follows:

No contract or purchase on behalf of the United States shall be made unless the same is authorized by law or is under an appropriation adequate to its fulfillment, except in the War and Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.

12 Stat. 214, 220. Congress reiterated the ban on obligations in excess of appropriations by enacting the Antideficiency Act in 1870:

[I]t shall not be lawful for any department of the government to expend in any one fiscal year any sum in excess of appropriations made by Congress for that fiscal year, or to involve the government in any contract for the future payment of money in excess of appropriations

Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251. Congress substantially reenacted this provision in 1905, adding the proviso "unless such contract or obligation is authorized by law," Act of March 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257, and reenacted it again in 1906, Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 27, 48. Section 665(a) of Title 31, United States Code, enacted in its current form in 1950, Act of Sept. 6, 1950, Pub. L. No 81-759, § 1211, 64 Stat. 595, 765, is substantially the same as these earlier versions, except that, by adding an express prohibition against unauthorized obligations "in advance of" appropriations to the prohibition against obligations "in excess of" appropriations, the modern version indicates even more forcefully Congress' intent to control the availability of funds to government officers and employees.

bilities that Congress has delegated to the official in broad terms, but without conferring specific authority to enter into contracts or otherwise obligate funds in advance of appropriations. For example, Attorney General McReynolds concluded, in 1913, that the Postmaster General could not obligate funds in excess of appropriations for the employment of temporary and auxiliary mail carriers to maintain regular service, notwithstanding his broad authorities for the carrying of the mails. 30 Op. Att'y Gen. 157, 161 (1913). Similarly, in 1877, Attorney General Devens concluded that the Secretary of War could not, in the absence of appropriations, accept "contributions" of materiel for the army, *e.g.,* ammunition and medical supplies, beyond the Secretary's specific authorities to contract in advance of appropriations. 15 Op. Att'y Gen. 209, 211 (1877).[6]

Ordinarily, then, should an agency's regular one-year appropriation lapse, the "authorized by law" exception to the Antideficiency Act would permit the agency to continue the obligation of funds to the extent that such obligations are: (1) funded by moneys, the obligational authority for which is not limited to one year, *e.g.,* multi-year appropriations; (2) authorized by statutes that expressly permit obligations in advance of appropriations; or (3) authorized by necessary implication from the specific terms of duties that have been imposed on, or of authorities that have been invested in, the agency.[7] A nearly government-wide lapse, however, such as occurred on October 1, 1980, implicates one further question of executive authority.

Unlike his subordinates, the President performs not only functions that are authorized by statute, but functions authorized by the Constitution as well. To take one obvious example, the President alone, under Article II, § 2, clause 1 of the Constitution, "shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." Manifestly, Congress could not deprive the President of this power by purporting to deny him the minimum

---

[6] *Accord,* 37 Comp. Gen. 155, 156 (1957) (Atomic Energy Commission's broad responsibilities under the Atomic Energy Act do not authorize it to enter into a contract for supplies or services to be furnished in a fiscal year subsequent to the year the contract is made); 28 Comp. Gen. 300, 302 (1948) (Treasury Department's discretion to establish reasonable compensation for Bureau of the Mint employees does not confer authority to grant wage increases that would lead to a deficiency).

[7] It was on this basis that I determined, in approving the September 30, 1980, memorandum, that the responsible departments are "authorized by law" to incur obligations in advance of appropriations for the administration of benefit payments under entitlement programs when the funds for the benefit payments themselves are not subject to a one-year appropriation. Certain so-called "entitlement programs," *e.g.,* Old-Age and Survivors Insurance, 42 U S.C § 401(a), are funded through trust funds into which a certain portion of the public revenues are automatically appropriated Notwithstanding this method of funding the entitlement payments themselves, the costs connected with the administration of the trust funds are subject to annual appropriations. 42 U.S.C. § 401(g). It might be argued that a lapse in administrative authority alone should be regarded as expressing Congress' intent that benefit payments also not continue. The continuing appropriation of funds for the benefit payments themselves, however, substantially belies this argument, especially when the benefit payments are to be rendered, at Congress' direction, pursuant to an entitlement formula. In the absence of a contrary legislative history to the benefit program or affirmative congressional measures to terminate the program, I think it proper to infer authority to continue the administration of the program to the extent of the remaining benefit funding.

obligational authority sufficient to carry this power into effect. Not all of the President's powers are so specifically enumerated, however, and the question must consequently arise, upon a government-wide lapse in appropriations, whether the Antideficiency Act should be construed as depriving the President of authority to obligate funds in connection with those initiatives that would otherwise fall within the President's powers.

In my judgment, the Antideficiency Act should not be read as necessarily precluding exercises of executive power through which the President, acting alone or through his subordinates, could have obligated funds in advance of appropriations had the Antideficiency Act not been enacted. With respect to certain of the President's functions, as illustrated above, such an interpretation could raise grave constitutional questions. It is an elementary rule that statutes should be interpreted, if possible, to preclude constitutional doubts, *Crowell* v. *Benson,* 285 U.S. 22, 62 (1932), and this rule should surely be followed in connection with a broad and general statute, such as 31 U.S.C. § 665(a), the history of which indicates no congressional consideration at all of the desirability of limiting otherwise constitutional presidential initiatives. The President, of course, cannot legislate his own obligational authorities; the legislative power rests with Congress. As set forth, however, in Mr. Justice Jackson's seminal concurring opinion in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 635 (1952):

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of Congress.

Following[8] this reasoning, the Antideficiency Act is not the only source of law or the only exercise of congressional power that must be weighed in determining whether the President has authority for an initiative that obligates funds in advance of appropriations. The President's obligational authority may be strengthened in connection with initiatives that are grounded in the peculiar institutional powers and

---

[8] A majority of the Supreme Court has repeatedly given express endorsement to Mr. Justice Jackson's view of the separation of powers. *Nixon* v. *Administrator of General Services,* 433 U.S. 425, 443 (1977); *Buckley* v. *Valeo,* 424 U.S. 1, 122 (1976); *United States* v. *Nixon,* 418 U.S. 683, 707 (1974); *Old Dominion Branch No. 496, National Association of Letter Carriers* v. *Austin,* 418 U.S. 264, 273 n.5 (1974).

competency of the President. His authority will be further buttressed in connection with any initiative that is consistent with statutes—and thus with the exercise of legislative power in an area of concurrent authority—that are more narrowly drawn than the Antideficiency Act and that would otherwise authorize the President to carry out his constitutionally assigned tasks in the manner he contemplates. In sum, with respect to any presidential initiative that is grounded in his constitutional role and consistent with statutes other than the Antideficiency Act that are relevant to the initiative, the policy objective of the Antideficiency Act must be considered in undertaking the initiative, but should not alone be regarded as dispositive of the question of authority.

Unfortunately, no catalogue is possible of those exercises of presidential power that may properly obligate funds in advance of appropriations.[9] Clearly, such an exercise of power could most readily be justified if the functions to be performed would assist the President in fulfilling his peculiar constitutional role, and Congress has otherwise authorized those or similar functions to be performed within the control of the President.[10] Other factors to be considered would be the urgency of the initiative and the likely extent to which funds would be obligated in advance of appropriations.

In sum, I construe the "authorized by law" exception contained within 31 U.S.C. § 665(a) as exempting from the prohibition enacted by the second clause of that section not only those obligations in advance of appropriations for which express or implied authority may be found in the enactments of Congress, but also those obligations necessarily incident to presidential intiatives undertaken within his constitutional powers.

## II.

In addition to regulating generally obligations in advance of appropriations, the Antideficiency Act further provides, in 31 U.S.C. § 665(b):

> No officer or employee of the United. States shall accept voluntary service for the United States. or employ per-

---

[9] As stated by Attorney General (later Justice) Murphy:

[T]he Executive has powers not enumerated in the statutes—powers derived not from statutory grants but from the Constitution. It is universally recognized that the constitutional duties of the Executive carry with them constitutional powers necessary for their proper performance. These constitutional powers have never been specifically defined, and in fact cannot be, since their extent and limitations are largely dependent upon conditions and circumstances. In a measure this is true with respect to most of the powers of the Executive, both constitutional and statutory. The right to take specific action might not exist under one state of facts, while under another it might be the absolute duty of the Executive to take such action.

39 Op. Att'y Gen. 343, 347–48 (1939).

[10] One likely category into which certain of these functions would fall would be "the conduct of foreign relations essential to the national security," referred to in the September 30, 1980, memorandum.

7

> sonal service in excess of that authorized by law, except in cases of emergency involving the safety of human life or the protection of property.

Despite the use of the term "voluntary service," the evident concern underlying this provision is not government agencies' acceptance of the benefit of services rendered without compensation. Rather, the original version of § 665(b) was enacted as part of an urgent deficiency appropriation act in 1884, Act of May 1, 1884, ch. 37, 23 Stat. 15, 17, in order to avoid claims for compensation arising from the unauthorized provision of services to the government by non-employees, and claims for additional compensation asserted by government employees performing extra services after hours. That is, under § 665(b), government officers and employees may not involve the government in contracts for *employment, i.e.,* for compensated labor, except in emergency situtations. 30 Op. Att'y Gen. 129, 131 (1913).

Under § 665(b), it is thus crucial, in construing the government's authority to continue functions in advance of appropriations, to interpret the phrase "emergencies involving the safety of human life or the protection of property." Although the legislative history of the phrase sheds only dim light on its precise meaning, this history, coupled with an administrative history—of which Congress is fully aware—of the interpretation of an identical phrase in a related budgeting context, suggests two rules for identifying those functions for which government officers may employ personal services for compensation in excess of legal authority other than § 665(b) itself. First, there must be some reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property. Second, there must be some reasonable likelihood that the safety of human life or the protection of property would be compromised, in some degree, by delay in the performance of the function in question.

As originally enacted in 1884, the provision forbade unauthorized employment "except in cases of *sudden* emergency involving the loss of human life or the *destruction* of property." 23 Stat. 17. (Emphasis added.) The clause was added to the House-passed version of the urgent deficiency bill on the floor of the Senate in order to preserve the function of the government's "life-saving stations." One Senator cautioned:

> In other words, at the life-saving stations of the United States, for instance, the officers in charge, no matter what the urgency and what the emergency might be, would be prevented [under the House-passed bill] from using the absolutely necessary aid which is extended to them in such cases because it had not been provided for by law in a statute.

15 Cong. Rec. 2,143 (1884) (remarks of Sen. Beck); *see also id.* at 3,410–11 (remarks of Rep. Randall). This brief discussion confirms what the originally enacted language itself suggests, namely, that Congress initially contemplated only a very narrow exception to what is now § 665(b), to be employed only in cases of dire necessity.

In 1950, however, Congress enacted the modern version of the Antideficiency Act and accepted revised language for 31 U.S.C. § 665(b) that had originally been suggested in a 1947 report to Congress by the Director of the Bureau of the Budget and the Comptroller General. Without elaboration, these officials proposed that "cases of sudden emergency" be amended to "cases of emergency," "loss of human life" to "safety of human life," and "destruction of property" to "protection of property." These changes were not qualified or explained by the report accompanying the 1947 recommendation or by any aspect of the legislative history of the general appropriations act for fiscal year 1951, which included the modern § 665(b). Act of September 6, 1950, Pub. L. No. 81–759, § 1211, 64 Stat. 765. Consequently, we infer from the plain import of the language of their amendments that the drafters intended to broaden the authority for emergency employment. In essence, they replaced the apparent suggestion of a need to show absolute necessity with a phrase more readily suggesting the sufficiency of a showing of reasonable necessity in connection with the safety of human life or the protection of property in general.

This interpretation is buttressed by the history of interpretation by the Bureau of the Budget and its successor, the Office of Management and Budget, of 31 U.S.C. § 665(e), which prohibits the apportionment or reapportionment of appropriated funds in a manner that would indicate the need for a deficiency or supplemental appropriation, except in, among other circumstances, "emergencies involving the safety of human life, [or] the protection of property." § 665(e)(1)(B).[11] Directors

---

[11] As provisions containing the same language, enacted at the same time, and aimed at related purposes, the emergency provisions of §§ 665(b) and 665(e)(1)(B) should not be deemed *in pari materia* and given a like construction, *Northcross* v. *Memphis Board of Education,* 412 U.S. 427, 428 (1973), although at first blush, it may appear that the consequences of identifying a function as an "emergency" function may differ under the two provisions. Under § 665(b), if a function is an emergency function, then a federal officer or employee may employ what otherwise would constitute unauthorized personal service for its performance; in this sense, the emergency nature of the function triggers additional obligational authority for the government. *In contrast, under* § 665(e)(1)(B), if a function is an emergency function, OMB may allow a deficiency apportionment or reapportionment—this permitting the expenditure of funds at a rate that could not be sustained for the entire fiscal year without a deficiency—but the effect of such administrative action would not be to trigger new obligational authority automatically. That is, Congress could always decline to enact a subsequent deficiency appropriation, thus keeping the level of spending at the previously appropriated level.)

This distinction, however, is outweighed by the common·practical effect of the two provisions, namely, that when authority is exercised under either emergency exception, Congress, in order to accomplish all those functions it has authorized, must appropriate more money. If, after a deficiency apportionment or reapportionment, Congress did not appropriate additional funds, its purposes would be thwarted to the extent that previously authorized functions could not be continued until the end of the fiscal year. This fact means that, although deficiency apportionments and reapportionments do not create new obligational authority, they frequently impose a necessity for further appropriations as

Continued

9

of the Bureau of the Budget and of the Office of Management and Budget have granted dozens of deficiency reapportionments under this subsection in the last 30 years, and have apparently imposed no test more stringent than the articulation of a reasonable relationship between the funded activity and the safety of human life or the protection of property. Activities for which deficiency apportionments have been granted on this basis include Federal Bureau of Investigation criminal investigations, legal services rendered by the Department of Agriculture in connection with state meat inspection programs and enforcement of the Wholesome Meat Act of 1967, 21 U.S.C. §§ 601–695, the protection and management of commodity inventories by the Commodity Credit Corporation, and the investigation of aircraft accidents by the National Transportation Safety Board. These few illustrations demonstrate the common sense approach that has guided the interpretation of § 665(e). [12] Most important, under § 665(e)(2), each apportionment or reapportionment indicating the need for a deficiency or supplemental appropriation has been reported contemporaneously to both Houses of Congress, and, in the face of these reports, Congress has not acted in any way to alter the relevant 1950 wording of § 665(e)(1)(B), which is, in this respect, identical to § 665(b). [13]

It was along these lines that I approved, for purposes of the immediate crisis, the categories of functions that the Director of the Office of Management and Budget included in his September 30, 1980, memorandum, as illustrative of the areas of government activity in which emergencies involving the safety of human life and the protec-

---

compelling as the government's employment of personal services in an emergency in advance of appropriations. There is thus no genuine reason for ascribing, as a matter of legal interpretation, greater or lesser scope to one emergency provision than to the other.

[12] In my April 25, 1980, memorandum to you, I opined that the Antideficiency Act permits departments and agencies to terminate operations, upon a lapse in appropriations, in an orderly way. 43 Op. Att'y Gen No. 24, at 1 [4 Op. O.L C.—(1980)]. The functions that, in my judgment, the orderly shutdown of an agency for an indefinite period or permanently would entail include the emergency protection, under § 665(b), of the agency's property by its own employees until such protection can be arranged by another agency with appropriations; compliance, within the "authorized by law" exception to § 665(a), with statutes providing for the rights of employees and the protection of government information; and the transfer, also under the "authorized by law" exception to § 665(a), of any matters within the agency's jurisdiction that are also under the jurisdiction of another agency that Congress has funded and thus indicated its intent to pursue. Compliance with the spirit, as well as the letter, of the Antideficiency Act requires that agencies incur obligations for these functions in advance of appropriations only to the minimum extent necessary to the fulfillment of their legal duties and with the end in mind of terminating operations for some substantial period It would hardly be prudent, much less consistent with the spirit of the Antideficiency Act, for agencies to incur obligations, in advance of appropriations in connection with "shutdown functions" that would only be justified by a more substantial lapse in appropriations than the agency, in its best judgment, expects.

[13] The Supreme Court has referred repeatedly to the-

venerable rule that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction.

*Red Lion Broadcasting Co.* v. *FCC,* 395 U.S. 367, 381 (1969) (footnotes omitted). Since enacting the modern Antideficiency Act, including § 665(e)(1)(B), in 1950, Congress has amended the act three times, including one amendment to another aspect of § 665(e). At no time has Congress altered this interpretation of § 665(e)(1)(B) by the Office of Management and Budget, which has been consistent and is consistent with the statute. *Compare* 43 Op. Att'y Gen. No. 24, 4 Op. O.L.C. 16 .(1980).

10

tion of property might arise. To erect the most solid foundation for the Executive Branch's practice in this regard, I would recommend that, in preparing contingency plans for periods of lapsed appropriations, each government department or agency provide for the Director of the Office of Management and Budget some written description, that could be transmitted to Congress, of what the head of the agency, assisted by its general counsel, considers to be the agency's emergency functions.

In suggesting the foregoing principles to guide the interpretation of § 665(b), I must add my view that, in emergency circumstances in which a government agency may employ personal service in excess of legal authority other than § 665(b), it may also, under the authority of § 665(b), it may also, under the authority of § 665(b), incur obligations in advance of appropriations for material to enable the employees involved to meet the emergency successfully. In order to effectuate the legislative intent that underlies a statute, it is ordinarily inferred that a statute "carries with it all means necessary and proper to carry out effectively the purposes of the law." *United States* v. *Louisiana,* 265 F. Supp. 703, 708 (E.D. La. 1966) (three-judge court), *aff'd,* 386 U.S. 270 (1967). Accordingly, when a statute confers authorities generally, those powers and duties necessary to effectuate the statute are implied. *See* 2A J. Sutherland, Statutes and Statutory Construction § 55.04 (Sands ed. 1973). Congress has contemplated expressly, in enacting § 655(b), that emergencies will exist that will justify incurring obligations for employee compensation in advance of appropriations; it must be assumed that, when such an emergency arises, Congress would intend those persons so employed to be able to accomplish their emergency functions with success. Congress, for example, having allowed the government to hire firefighters must surely have intended that water and firetrucks would be available to them.[14]

### III.

The foregoing discussion articulates the principles according to which, in my judgment, the Executive can properly identify those functions that the government may continue upon lapses in appropriations. Should a situation again present itself as extreme as the emergency that arose on October 1, 1980, this analysis should assist in guiding planning by all departments and agencies of the government.

As the law is now written, the Nation must rely initially for the efficient operation of government on the timely and responsible functioning of the legislative process. The Constitution and the

---

[14] *Accord,* 53 Comp. Gen. 71 (1973), holding that, in light of a determination by the Administrator of General Services that such expenses were "necessarily incidental to the protection of property of the United States during an extreme emergency," *id.* at 74, the Comptroller General would not question General Services Administration (GSA) payments for food for GSA special police who were providing round-the-clock protection for a Bureau of Indian Affairs building that had been occupied without authority.

Antideficiency Act itself leave the Executive leeway to perform essential functions and make the government "workable." Any inconvenience that this system, in extreme circumstances, may bode is outweighed, in my estimation, by the salutary distribution of power that it embodies.

Respectfully,
BENJAMIN R. CIVILETTI