UNITED STATES of America, Plaintiff,

v.

John W. JONES, Jr., et al., Defendants.

Civ. A. No. 93–0745–CB–M.

United States District Court,
S.D. Alabama, N.D.

March 14, 1994.

See also 837 F.Supp. 1145.

**956**

Philip Henry Pitts, Bruce Boynton, Selma, AL, for defendants Deans Barber, John Lide, Erskine Minor, Roy Moore and Perry Varner.

John W. Kelly, Selma, AL, for defendants Dallas Bd. of Registrars, Marie Foster, John W. Jones, W.A. Kynard, John Lide, Erskine Minor, Roy Moore, W.D. Nichols, Joe Peasant, Gwendolyn M. Shaw, Ed Vancil, Perry Varner and Curtis Williams.

Cartledge W. Blackwell, Selma, AL, for defendants John W. Jones and W.D. Nichols.

William T. Faile, Selma, AL, for defendant John Lide.

John E. Pilcher, Selma, AL, for defendant W.D. Nichols.

J. Gerald Hebert, Deanne E.B. Ross, Voting Section, Civil Rights Div., Dept. of Justice, Washington, DC, for plaintiff USA.

J.L. Chestnut, Selma, AL, for defendant and plaintiff intervenor Curtis Williams.

1. Williams, who ran as an independent candidate, held a 4 vote lead after the ballots had been initially counted.

2. *Williams v. Lide*, 628 So.2d 531 (Ala.1993).

3. The government's action came some ten months after the November election and two weeks after the decision of the Alabama Supreme Court.

## ORDER

BUTLER, District Judge.

After concluding that this Court had jurisdiction to hear this matter under § 2 of the Voting Rights Act and the Constitution (in its Order of January 20th, 1994 denying the defendants' motion to dismiss), the Court held a hearing on the merits in Selma, Alabama on January 24th, 1994 and heard testimony **ore tenus.** After consideration of the testimony and other evidence submitted by the parties, the court determines that the government has failed to prove a violation of either the Constitution or the Voting Rights Act, and therefore finds in favor of the defendants.

### I. Factual Background

#### A. Procedural History

In April 1993, John Lide, the white Democratic candidate, won an election contest in the Circuit Court of Dallas County and was declared the winner of the November 3rd, 1992 District Two County Commission race by a 10 vote margin over the apparent winner of the election, the Reverend Curtis Williams, who is black.[1] The Alabama Supreme Court subsequently upheld Lide's Circuit Court victory.[2] This action followed in September of 1993 when the United States determined, and now by undisputed deposition testimony and stipulation has established, that at least 52 white voters who lived outside District 2 improperly voted for Lide in the November 3rd County Commission election.[3]

These 52 are different voters than the 71 who were the subject of challenges by both Lide and Williams in the State election proceeding.[4] For some inexplicable reason, these 52 voters, including 28 who lived in a subdivision known as Pine Forest Estates

4. It is also important to note that these aren't the only voters who crossed lines during the November 1992 District 2 election; there were 27 voters erroneously **excluded** from District 2 in the 1992 general election who were just recently discovered to have been accidentally placed in District 4 (Tr. pp. 121–122).

(See Government Ex. 53), were not challenged in ·the State election contest. Their erroneous inclusion in District 2 is a matter that clearly could' have been fairly litigated in the State election contest, where, as the Alabama Supreme· Court stated:

> "... the parties contested 71 challenged ballots ... The grounds for contesting the votes were ... (1) the voter did not reside in district 2 ..." *Williams v. Lide,* 628 So.2d at 534.

There is no suggestion, nor any evidence, that the State election contest proceeding was in any way deficient. Had he chosen to do so, Williams could have successfully challenged these very same 52 voters and thereby been declared the undisputed winner by the Alabama courts (Tr. pp. 307–310).[5] · Nor is there any evidence that there were any racially designed measures or impediments placed in Williams's path, or before any voter of Dallas County for that matter, which would have prevented them from presenting this evidence to the Alabama courts and thus obtaining relief from an erroneous election result.

### B. March–June 1992: Election Preparation and Practice

County-wide elections are conducted in Dallas County, as in all Alabama counties, with the Probate Judge as the chief election official who is required to publish the list of qualified voters by district, *Ala.Code* § 17–4–129 (1975), and furnish the list to the polling inspectors in each ward. *Id.* § 17–4–130. The voter registration lists are' prepared, maintained, updated and furnished to the Probate Judge by the Board of Registrars. *Id.* § 17–14–130. Defendant John W. Jones, Jr., who is white, has been the Probate Judge of Dallas County since 1977 (Tr. p. 154) The Probate Judge also tabulates the votes at the conclusion of the election.

The Dallas County Board of Registrars consists of its chairman, Joseph Peasant, who is black, and. Edgar A. Vancil, the only white member, both of whom have been on the Board since October of 1991, and Marie Foster, a black woman who has been on the Board since approximately 1987 (Tr. p. 278). In 1991 and 1992, the Board functioned primarily through the use of approximately 60 to 80 deputy registrars (see Depo. of Joseph Peasant, pp. 8, 95–96), three of whom worked in the Judge of Probate's Office (two whites and one black). The primary duty of the deputy registrars is to register all qualified voters and place them in the proper voting district. The Board then prepares a master voter's list from information stored in the computer system maintained at the Dallas · County Courthouse (Peasant Depo. p. 9). All three .of the Board members enter voter information on.the computer (Peasant Depo. p. 12), although Chairman Peasant testified Ed Vancil does most of it (Peasant Depo. p. 17).

On March 20th, 1992, the Dallas .County Commission.adopted its redistricting Plan A which was essentially the same as the Dallas County School Board Plan C (Tr. p. 235). One difference between the County Commission Plan and the School Board Plan was in District 2, as Pine Forest Subdivision was included in District 2 in the School Board's Plan but not under the County Commission Plan (Pretrial Order Agreed Fact No. 5). On March 26th, 1992, the Dallas County Court submitted redistricting plan A to the Justice Department for approval, and it was precleared on May 12th, 1992. The plan provided for five single member districts with the following population and racial composition (Pretrial Order Agreed Fact 3(C)):

| District Number | Population | Percentage Black |
|---|---|---|
| 1 | 9,789 | 82.4 |
| 2 | 9,354 | 65.4 [6] |
| 3 | 9,490 | 76.7 |
| 4 | 9,864 | 31.0 |
| 5 | 9,633 | 33.8 |

---

**5.** *Ala.Code* § 17–4–127 (1975) provides that any ballot cast by a voter in a district where he does not reside ... "upon a contest duly instituted ... shall be excluded in determining the final result of any election; ..." References (Tr. pp) are to the Court Reporter's Transcript of the Record prepared for the parties at the conclusion of the trial.

**6.** The 52 illegal votes would have changed these figures to 9,406 total population and 65% black, a percentage which meant District 2 remained a swing seat, rather than throwing the balance over to the white candidate's favor. *See generally U.S. v. Dallas County Com'n, Dallas County, Ala.,* 850 F.2d 1433, 1441 (11th Cir.1988); *Rollins v. Dallas County Commission,* Civ. Action

When this was done there were predictions of confusion at the polls in the June 1992 primary elections because of the task the Board of Registrars would have in identifying and properly placing those voters in the various districts who would be affected by the redistricting plan (Tr. p. 22). Board of Registrars member Vancil testified that the County Commission had not presented either a map of the proposed plan nor of the pre-cleared plan to the Board prior to the election, but that he had gotten the plan from the Probate Judge's office (Tr. pp. 79–80). According to Judge Jones, the confusion arose because the map that the Dallas County Commission advertised in the *Selma Times-Journal* in March of 1992 (Ex. 26(a)) turned out to be different in several particulars from the map that the County Commission had sent to the Justice Department and the map that was ultimately precleared. (Tr. pp. 156–158). The total number of voters affected by these changes in the redistricting of District 2 alone was from 2,000 to 3,000 and County-wide, 4,000 to 4,500. (Tr. p. 82). In the latter part of May, the Board of Registrars began updating their records at the rate of about 500 voters per day to correctly locate all of the newly redistricted voters throughout the five districts in the County. (Tr. p. 90–91). Around the same time, the Board began a mass transfer of voters between District 2 and District 5 by computer.

Because of the uncertainty in the placement of voters, and the difficulty of the task facing them, Judge Jones and Board Chairman Peasant went to the County Commission [7] on May 20th, 1992 asking for aid in identifying these voters (Tr. p. 32), and the Commission agreed to help (Tr. pp. 236–237). The Board of Registrars undertook to find the voters who were affected by the redistricting and to place them in the proper district (Tr. p. 33). The June 1992 primary and subsequent runoff were conducted and poll lists were prepared of all voters who participated (Tr. p. 61), and the Board entered those names in their computer in compliance with State law. Lide, black candidate Pope, and another black candidate had run in the primary, and since no one received a majority of the votes, a runoff was forced which Lide won over Pope by about 300 votes (Tr. p. 282). Immediately after the primary and at the next County Commission meeting, Pope accused Board of Registrar member Vancil of allowing white voters who resided outside District 2 to vote in the District 2 runoff (who are presumably some of the same voters challenged in this action) (Tr. pp. 238–244).[8] Nevertheless no action was taken to remedy this situation by the black controlled Commission, the black controlled Board of Registrars, nor any voter of Dallas County, nor Curtis Williams in his subsequent election contest, nor the Justice Department, until after the Circuit Court and then the Alabama Supreme Court had upheld Lide's election contest victory.

Judge Jones testified, and the Court so finds, that in the June 2nd primary election several hundred voters were placed in the wrong districts (Tr. p. 211 and at 221). Although there was testimony suggesting improper motives and bias on Judge Jones' part, the Court finds it unnecessary to attribute any such motive or bias to Judge Jones because there is no evidence that any such motive or bias, even if it existed, caused the improper allowance of voters to vote in District 2, when the sole duty and responsibility for that function rested with the Board of Registrars. The fact that Board of Registrars member Vancil, a white, entered most of the names on the computer, and that two of the three Deputy Registrars in the Judge of Probate's office are white, is not evidence of a racially motivated voting irregularity, pattern, or practice.

### C. November 1992: The 52 Illegal Voters

It is clear that the 52 voters in question lived on the eastern border of the reconstituted District 2, and 28 of them lived in the Pine Forest Subdivision area. The others are scattered just outside the District line.

No. 92–0242–B–C, 1992 U.S.Dist. LEXIS 15345, *4 (S.D.Ala. May 13, 1992).

7. The County Commission, since 1988, had consisted of three black and two white members.

8. Even if the Court assumes all 52 of the same voters voted for Lide against Pope, Lide's 300 vote win over Pope would not have been invalidated for that reason alone.

(See Gov't Exhibit 34). A number of voters along Wright Drive were erroneously included in District 2 because of the peculiar way Wright Drive's residences are numbered, thus leading the Board of Registrars to erroneously conclude that certain odd number residences were in District 2, when in fact they were in District 5 (Tr. 110–112). There were other similar errors that account for the rest of the non-Pine Forest voters who were erroneously allowed to vote in District 2 (Tr. 112–116). Considering all of the circumstances, this Court finds that these are no more than the type of errors one would expect in the normal course of any election, and especially in the circumstances surrounding the necessity of the Board of Registrars focusing in a very short time on relocating some 2,000 to 3,000 voters in the new District 2 alone.

The misunderstanding about the voters in the Pine Forest Subdivision was based on the use of the Board of Registrars of a commercially produced map of the City of Selma, known as the "Merchants Map" (Gov't Ex. 48), which erroneously showed all of the Pine Forest Subdivision to be just outside Selma's southwest city limit, and thus properly included in District 2. Accordingly, they were left out of the mass transfer between District 2 and District 5, where they belonged. It was not until after the November 1992 election, and just several days before the last city council election held in August of 1993 (Tr. pp. 47–48, 106), that it was discovered that these votes had been erroneously excluded from city elections for years (Tr. p. 139). As the court will explain later in this order, how and why this happened is not attributable to any evidence of intentional or racially discriminatory motive or purpose. It was a mistake, plain and simple. The Tax Assessor's map (Ex. 27), which had been in existence since 1975 and accurately showed that part of Pine Forest Subdivision was in the city limits (and thus should not have been part of District 2), was available to any County Commissioner or member of the Board of Registrars or any citizen to examine, and correct the obvious error (Tr. p. 137–138).

The failure of anyone to do so is largely responsible for the turmoil that the resolution of this suit will hopefully quiet.

## II. Legal Issues

The government brings this action under the Constitution and Section 2 of the Voting Rights Act.[9] Since a constitutional violation is more difficult to prove than a Section 2 transgression, the court will address the former allegation first.

### A. Constitutional Analysis

■ Unlike Section 2, the Constitution is only violated in this context by actions taken by election officials with a racially discriminatory purpose. *Bolden v. City of Mobile,* 446 U.S. 55, 62–63, 100 S.Ct. 1490, 1497–98, 64 L.Ed.2d 47 (1980). To establish the existence of such a purpose, the Supreme Court has held the following factors to be "subjects of proper inquiry", although not exhaustive: the impact of the allegedly discriminatory action, its historical background, "(t)he specific sequence of events leading up to the challenged decision", departures from normal procedural and substantive methods, and the legislative or administrative history underlying the complained-of event. *Arlington Heights v. Metro Housing Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977). All of these factors presuppose proof of an intentional act on the part of the defendants as a necessary prerequisite to any demonstration that the intentional act was also intentionally discriminatory. Thus, the court must first determine whether the government has proven an intentional act or acts by the defendants before it need assess whether any individual act was undertaken with an intent to discriminate.

The government claims it has established intentionally discriminatory actions on the part of the defendant election officials through a variety of episodes and occurrences from the time the Dallas County redistricting plan was sent to Washington for approval in March 1992 to the days following

---

9. The government's constitutional claims are brought pursuant to the Fourteenth and Fifteenth Amendments.

the November general election of that year. In the government's words, these facts "bolster( ) the inference that improper motives were at work in the November general election." Government's Post–Trial Brief, p. 18.

The court has no doubt that there was ample reason for suspicions to have been aroused about "improper motives" in Dallas County before, during and after the November election; if that was all the government had to prove, most elections conducted in Dallas County (and, for that matter, everywhere else in this nation) would violate the dictates of the Constitution. The reason most elections, and this one, meet constitutional muster is that the government cannot rest on suspicions about motives; they must prove that the defendants put those improper motives into action by taking steps commensurate with their supposedly shady intentions. Although the incidents cited by the government attest to motive, and perhaps even desire, they do not establish action, as the following analysis will show.

1. March–June 1992: Pre–Primary Actions of the Defendants

On March 26, 1992, the Dallas County Commission adopted a redistricting plan and forwarded it to the Justice Department for preclearance in accord with Section 5 of the Voting Rights Act.[10] While awaiting word from Washington on the acceptability of the new plan, Probate Judge Jones began predicting that "chaos and confusion" would mar the upcoming June primaries, since the Board of Registrars and his office would have little time to make sure that affected voters were correctly placed in their new districts. Despite his concerns, Probate Judge Jones made no effort to notify voters affected by the proposed new plan during March or April, nor did any member of the Board of Registrars.[11]

The redistricting plan received the approval of the Justice Department on May

12, 1992, and on May 20, Judge Jones and Board of Registrars Chairman Peasant went before the Dallas County Commission and expressed concern about the difficulty of notifying all the voters whose district had been changed by the new plan in time for the June 2 primary. The Commission was apparently unimpressed; Commissioner Perry Varner, who is black, voiced the opinion that Jones and Peasant were "making a mountain out of a molehill", since the changes made by the new plan seemed insubstantial to him. Government's Exhibit 26A (May 21, 1992 article in the *Selma Times–Journal*). Still, the Commission agreed to provide the Board of Registrars with some assistance in the notification process; this help ultimately took the form of a single Commission employee. The government alleges that the fact that the defendants did not begin the notification process earlier and with more vigor, despite the stated fears of Judge Jones, evinces intent on the part of the defendants to engage in racially discriminatory acts—namely, to allow out-of-district white voters to participate in the District 2 primary and general election. This conclusion is dubious for several reasons.

First, there is no evidence that any Dallas County official knew that the plan would be approved by the Justice Department when it was sent off in March; since the plan was not precleared until May 12, any effort to notify voters before that date would have been wasted and most likely confused voters had the Justice Department rejected the plan. The lack of activity by the defendants before May 12 is likely the result of caution (or, at the most, carelessness).

Second, once the plan was approved, Jones requested the aid of the Dallas County Commission in notifying those voters affected by the changes. Unless the court is to assume that Jones made the request solely to cover his tracks, secure in the knowledge that it

---

10. Under 42 U.S.C. 1973c, also known as Section 5 of the Voting Rights Act, certain subject jurisdictions, which include Dallas County, must submit any changes in their electoral structures to the Justice Department in advance for "preclearance" of those alterations to assure that they do not impair any citizen's right to vote.

11. As noted earlier, the Dallas County Board of Registrars, which is vested with the statutory duty to register voters, consists of Joe Peasant, who serves as chairman, Marie Foster, and Edgar Vancil; Mr. Peasant and Ms. Foster are black, and Mr. Vancil, one of the defendants in this suit, is white.

would be half-heartedly met, this petition hardly seems the act of someone attempting to frustrate the Constitution through inactivity.

Third, if the government's theory was correct, Jones' decision to publicly express concern about the impact of the changes on the primary races becomes an act of senselessness, especially given the blase attitude of the Dallas County Commission. Had the defendants been conspiring to use confusion over redistricting as camouflage for their manipulation of white votes, the most prudent course would have been to remain silent while pursuing their schemes. Instead, Jones went before the Commission and made the statements that the government now cites as proof of the need to take earlier and more active steps with regard to the changes wrought by redistricting. Unless the defendants are masters of a logic so byzantine as to defy reason, the simplest explanation for Jones' behavior is honest concern, not base plotting.

Finally, there is no evidence that the defendants' inactivity was designed or carried out in a fashion that would solely injure the interests of black voters; any errors which would have likely resulted from the defendants' alleged failure to do their jobs would have likely affected all districts. For example, more than suspicion would be raised had the defendants assiduously policed the two majority white districts in Dallas County while turning a blind eye to registration fraud in the three black majority districts (which include District 2). Whatever inaction is attributable to the defendants, however, applies in equal force to all the districts and would have had a foreseeable effect on all voters, black and white.

In sum, the actions of the defendants before the June primary establish lax attention to duties, at most, and while this attitude (which was shared by both the Commission and the Board of Registrars) probably increased the likelihood that voters would cross district lines, there is no evidence that the inactivity was intentional, nor any proof that it was aimed at affecting blacks more than whites.

### 2. June–Nov. 1992: Post–Primary Actions of the Defendants

■ With regard to this time frame, the government argues that two factors compel the conclusion that the defendants acted with discriminatory intent. First, there was the failure of election officials to correct the District 2 poll lists after the then-current District 2 Commissioner D.L. Pope charged, following the June primary that forced him into a runoff for the District 2 Democratic nomination with Lide, that white voters had impermissibly cast ballots in the June primary. In addition, there is the admission by Probate Judge Jones that he was aware that illegal voting had occurred in the primary. At first glance, these facts strongly imply willful conduct. On closer inspection, however, neither incident proves action or even intent.

Pope made his comments at a Commission meeting held soon after the June 2 primary. At the meeting, Pope accused Board of Registrars member Vancil of allowing whites who did not live in District 2 to vote in that District's primary, with the end result of landing him in a runoff with Lide despite the District's 65.4% black majority. The government takes this finger-pointing at face value, which gives it far more credence than witnesses to the scene did, as the Commission apparently believed Pope's outburst was attributable more to sour grapes than to legitimate grounds. Perry Varner, the black County Commissioner from District 3, testified that he did not report Pope's allegations to the Justice Department, or take any other remedial action, because "I personally thought he was angry because he was in a runoff and didn't win it right away ... I thought the election went quite well." Trial Transcript, p. 242–43. Varner was not alone; the Dallas County Commission also declined to investigate the allegations. Unless the court is to believe that black officials and citizens in Dallas County are inordinately passive in the face of white skullduggery— which is a conclusion the civil rights movement of the 50's and 60's, and subsequent race-related litigation, eloquently refute—or that white officials were able to go about their alleged illegal acts in secret—which

seems highly unlikely in the vigilant realm of Dallas County race relations—the plain conclusion to be drawn from the inaction of black and white officials is that Pope's accusations were thought to be false, or that the responsible officials assumed that any errors would be duly corrected, in the time honored fashion of bureaucracy, by "someone". In either event, the government's imputation of deliberate action by white election officials is undermined.

Similarly, Jones' testimony regarding illegal ballots is far less damning than the government contends. While he did admit that "there could be several hundred voters that (were) not correctly placed or in the wrong district", he qualified the statement immediately by noting that "you have to understand, that is probably—that probably happens in any election." Tr. pp. 66–67. At the most, the evidence shows that Judge Jones was aware of the likelihood, given the confusion surrounding the redistricting plan and elections in general, that some voters would vote out of their proper district. This admission is most notable for what it fails to establish: that Judge Jones was aware of either the particular existence of the 52 voters challenged here or of the racial makeup of this theoretical pool of illegal voters.

Moreover, Jones testified that, while he initially believed widespread confusion would plague the June primary following the rushed adoption of the redistricting plan, his fears turned out in retrospect to be unfounded. His opinion was altered by the fact that there was no stream of voters seeking correction of their registration status after running into problems in the June primary. Of course, an illegal voter who encounters no obstacles in casting their ballot can hardly be expected to make himself known, but while this approach to voter registration may be rather passive, it hardly rises to the level of intentional discrimination.[12]

### 3. Events During the November 1992 election

■ The government points to the established fact that 52 white voters illegally cast ballots in District 2 for Lide as proof of discriminatory intent. However, demonstrating that illegal votes were counted is only the first step; in and of themselves, these ballots prove nothing about the intent of the defendant election officials. Once again, while the government has shown that the circumstances are arguably suspicious, they have failed to show anything more.

First of all, the uncertainty surrounding the June primary, and the faulty methodology for discovering errors in registration between the primary and the November election challenged here, has been acknowledged by all parties; indeed, the government relies on the June confusion and subsequent lapses for proof of intent during those periods. Although the court has found that these circumstances do not evince intent, they doubtlessly resulted in out-of-district voting, and partially explain it.

Next, a number of the 52 voters were erroneously placed in District 2 because of inconsistencies in the numbering of street addresses in the county. The government's argument for intent in their placement rests on the simple fact that they were put in District 2. Without more, these voters attest only to run-of-the-mill mistakes, not unconstitutional intent.

Finally, there are the 28 voters who lived in the Pine Forest subdivision at the time of the November election. Most of Pine Forest is located inside Selma city limits, and thus belonged in District 5 under the redistricting plan. Despite this, the voters from Pine Forest were listed as being in District 2 and cast ballots there on November 2 for Lide. The government contends that this is strong evidence of intentional action by the defendants to throw the election to Lide.

According to the uncontradicted testimony of Board of Registrars member Vancil, how-

---

**12.** The government also sees insidious intent in Judge Jones' active involvement in Lide's campaign. While Jones would have been hard pressed to make his wishes concerning the outcome of the District 2 race any plainer, mere suspicion does not equal proof, and the government has failed to show anything more than suspicion with respect to Judge Jones' conduct of his official duties.

ever, until August, 1993, the Pine Forest subdivision was thought to lie outside Selma city limits, where it was placed by a map used by the Board of Registrars in assigning voters to districts; this was apparently the result of an error made years ago by the Board of Registrars and compounded by inaccuracies in the Board's map.[13] Because most of this subdivision was thought to be in the county, the voters within it were not transferred to District 5, as the redistricting plan dictated for Selma residents in that area, but rather were kept in District 2, where the plan placed county residents.

This mishap did not arise in the course of the redistricting procedure. These voters had been erroneously forbidden to vote in Selma city elections for years, despite the fact that they were actually Selma residents. Most importantly for the court's purposes in assessing the state of mind of white election officials in Dallas County, these voters were not allowed to vote in Selma city elections during a period when Selma went from being a white majority city to a black majority one.[14] Obviously, had white officials in the perceived no holds barred world of Dallas County elections known that a significant number of white voters were eligible to participate in Selma city elections, but not listed as such because of a clerical error, they would have promptly redressed the situation.[15] The fact that they didn't take such

action strongly suggests that election officials were unaware of the particular existence of the Pine Forest voters, and makes it exceedingly unlikely that white election officials used the Pine Forest voters as chess pieces to throw the District 2 election to Lide.

### 4. Post–General Election Actions [16]

Finally, the court notes that, prior to this case, both candidates, and their supporters, engaged in a bitter and detailed election contest in state court. Despite the exhaustive amount of investigation and testimony connected with that case, these 52 illegal voters somehow escaped notice until the government discovered them in the course of an FBI investigation. Black county and election officials were intimately involved in Williams' legal fight for office, yet no challenge was made to these particular voters in the state case. Unless the court is to assume that white officials were somehow so much cannier than their black counterparts as to be both fully aware of and able to manipulate 52 white voters into District 2, the most logical conclusion is that the illegal voters were accidents, not pawns.

Since the court has found the defendants' actions in allowing the 52 out-of-district voters to cast ballots in District 2 were unwitting errors, and a mistake cannot be intentionally discriminatory,[17] the court necessarily finds that there is no proof of intentional

---

13. The truth was discovered when a couple who resided in Pine Forest came to the Registrars' office and informed officials that they did live within Selma city limits; reference was made to the local tax assessors' map, which accurately included Pine Forest within Selma, and the Board immediately corrected its records.

14. In 1970, Selma had a total population of 27,379, of which 13,731 were white and 13,648 were of other races. By 1980, the town's population had fallen to 26,684, of which only 12,392 were white. CENTER FOR BUSINESS AND ECONOMIC RESEARCH, ECONOMIC ABSTRACT OF ALABAMA 434 (The University of Alabama, 1987). The percentage of black residents continued to increase throughout the 1980's. *Varner v. Smitherman*, Civ. Action No. 92–0586–BH–M, 1993 U.S.Dist. LEXIS 17721, *2–*3 (S.D.Ala. Dec. 8, 1993).

15. According to the testimony of Board of Registrars member Vancil, Pine Forest is "virtually" all white. Tr. p. 54.

16. The government cites Judge Jones' refusal to certify Williams as the winner of the November District 2 election as soon as the initial votes were counted as proof of Jones' discriminatory actions. Jones, however, also refused to certify Lide as the winner after his supporters found 20 challenged ballots, which they insisted should be counted in Lide's favor. Faced with this dispute, Jones promptly sought a declaratory judgment from the Circuit Court of Dallas County on the issue of the rightful winner of the District 2 race. In retrospect, it is difficult to conceive of any more prudent decision Judge Jones could have made; certainly, in light of the subsequent decision of the Alabama Supreme Court, certifying Williams in the face of what were later held to be legitimate doubts as to the validity of his vote total would have been rash.

17. Although it probably goes without saying, this is true for the simple reason that every pure mistake is unintentional.

discrimination, and therefore no constitutional claim.

## B. Section 2 Claim

### 1. Statutory Analysis

 Section 2 of the Voting Rights Act provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice or procedures shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizens of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title as provided in subsection (b) of this section.

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of the class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice ...

The right to vote includes the right not to have one's vote diluted by the tallying of illegitimate ballots. *Reynolds v. Sims,* 377 U.S. 533, 554–55, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964). Section 2 was amended by Congress in 1982 to make clear that no proof of discriminatory intent is required to establish a violation of the law. S.Rep. No. 97–417, 97th Cong., 2d Sess. 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205. Moreover, "the Voting Rights Act reaches (actions) that affect even a single election." *NAACP v. Hampton County Election Commission,* 470 U.S. 166, 178, 105 S.Ct. 1128, 1135, 84 L.Ed.2d 124 (1985). Most cases, however, have involved entrenched electoral

practices, such as at-large elections, rather than one-of-a-kind incidents such as occurred in this case. The Senate Report notes that "(i)f the challenged practice relates to such a series of events or episodes, the proof sufficient to establish a violation would not necessarily involve the same factors as the courts have utilized when dealing with permanent structural barriers", S.Rep. No. 97–417 at 30, 1982 U.S.C.C.A.N. at 207, and most courts that have addressed alleged episodic violations of Section 2 have not applied those factors. *See, e.g., Welch v. McKenzie,* 765 F.2d 1311 (5th Cir.1985); *Brown v. Dean,* 555 F.Supp. 502 (D.R.I.1982). Whether these factors are considered or not, however, "the ultimate test would be ·... whether, in the particular situation, the (episodic) practice operated to deny the minority (candidate) an equal opportunity to participate and to elect candidates of their (sic) choice." S.Rep. No. 97–417 at 30, 1982 U.S.C.C.A.N. at 207.

 The government contends that it has shown discriminatory intent on the part of Dallas County election officials, but asserts that even if they have failed to make such a showing, relief is still due under Section 2 for the simple reason that Williams, the black candidate, lost an election he would have won had election officials not mistakenly allowed the out-of-district white voters to participate in the District 2 balloting. In the absence of any cited authority for this expansive proposition, the court finds that it overstates the law.[18]

First, while Section 2 covers "standard, practice or procedures", and these words include within their meaning single events, there is no language in either the statute or case law which states that even unwitting mistakes are covered. The normal definition of all those terms implies some willful act on the part of election officials, albeit no willfully *discriminatory* act.[19] Were the govern-

---

18. At least one court has held that the Voting Rights Act offers no protection "against dilution by illegal voting whether or not the dilution was wilful or knowing." *Powell v. Power,* 436 F.2d 84, 88 (2nd Cir.1970). Since there was no allegation of racial discrimination in that case, however, the court does not consider that holding to

be entirely dispositive of the issue confronting it today.

19. For example, "practice" is alternately defined as "actual performance or application", "a repeated or customary action", and "the usual way of doing something", WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 923 (Frederick C.

ment's proposition correct, and mere oversights actionable under Section 2, the Voting Rights Act would be violated whenever minority voters are accidentally dropped from a voters' registration list, or white voters are unwittingly allowed to vote in an election, and the white candidate wins. Given that mistakes no doubt occur in every close election held in this nation, the government's interpretation of the Voting Rights Act would offer relief through that statute to every aggrieved minority candidate in each of these instances, despite the existence of state procedures specifically designed to handle such garden-variety election disputes. In the absence of specific language to that effect from either Congress or another court, this reading of the Voting Rights Act is highly questionable.

### 2. Relevant Case Law

This finding is bolstered by a review of the relatively few suits brought under Section 2. These cases are roughly divided between ones in which the plaintiff prevailed and ones in which no violation of Section 2 was found; the two lines of decisions are distinguishable on the issues of whether election officials engaged in some deliberate (that is, non-accidental) act, and whether the election process was inordinately dominated by the white majority. In *Toney v. White*, 488 F.2d 310 (5th Cir.1973) (en banc), the voting Registrar in Madison Parish, Louisiana, purged black voters who had not recently exercised their franchise from election rolls, but did not drop similarly situated white voters from the list. This action took place within thirty days before a local election, in which white candidates ended up victorious in the large majority of races. The court did not overturn the district court's finding of no racially discriminatory purpose, but held that, whatever the Registrar's motive, the net result was discriminatory, and violated Section 2. Similarly, in *Brown v. Post*, 279 F.Supp. 60 (W.D.La.1968), the Madison Parish clerk made absentee ballots available to white voters without taking equal steps to aid black voters; again, the Fifth Circuit found that Section 2 was violated by this discriminatory practice.

On the other hand, no relief was granted in *Welch*, 765 F.2d at 1311. In that case, the white candidate Hood outpolled the black candidate Welch in a Democratic Party run-off election by 877 to 858; however, on close examination by Welch and his campaign workers, over a hundred absentee ballots cast for Hood appeared to violate Mississippi law. After a meeting of local party officials, a committee comprised of both black and white party members voted to certify Hood as the winner. Welch then sued in federal court under Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. The district court decided that, although Mississippi's election laws had been flaunted, no Section 2 or constitutional violations were shown.

In an opinion affirming the district court, the Fifth Circuit held that, while Section 2 did not require a showing of discriminatory intent, and episodic events were covered by the statute, "(w)ithout racial motivation or state-created impairment of black votes, there (is) no violation of Section 2 of the Voting Rights Act. Otherwise stated, stolen elections in which the losing candidate was black are, while decidedly suspicious, *not necessarily violations of the Voting Rights Act or the Constitution.*" *Welch*, 765 F.2d at 1316–1317 (emphasis added).

In *Hubbard v. Ammerman*, 465 F.2d 1169 (5th Cir.1972),[20] two candidates in a Democratic primary sought the party nomination for the judgeship of a Texas county. After Ammerman ostensibly won, Collins, the other candidate, brought suit in a Texas state court, alleging that illegal ballots had been

---

Mish, ed. in chief, 1988); "procedure" is defined as "a particular way of accomplishing something or of acting" and "a series of steps followed in a regular definite order", and "a traditional or established way of doing things", *id.* at 937; "standard" is defined as "something established by authority, custom, or general consent as a model or example", *id.* at 1148. All of these definitions appear to preclude their synonymous use with the errors the court finds to have occurred here.

**20.** As *Hubbard* was decided before October 1, 1981, it is binding precedent in this circuit as well as the Fifth Circuit. See *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

cast for Ammerman, primarily in the form of bogus absentee ballots sent in on behalf of black voters, but without their authorization. While that case was pending, a local voter named Hubbard (along with several others) brought an action in federal court under the Voting Rights Act, claiming that the counting of the fraudulent ballots had diluted their votes and that Collins was the legitimate victor in the primary.

After much procedural and jurisdictional wrangling, the Texas state court dismissed the complaint before it, on the grounds that it was mooted by the passage of the general election date. The federal district court, meanwhile, tried the Voting Rights Act case, and after finding that the ballots counted for Ammerman were illegally cast, effectively named Collins the winner of both the nomination and judgeship. On appeal, the Fifth Circuit overturned the district court and held that, in the absence of evidence (as opposed to a "possibility") of racial discrimination through state action, the district court lacked jurisdiction over what was essentially a state dispute. *Id.* at 1181.

A similar line was followed in *Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978). There, while the 1st Circuit found a violation of Section 2 when the state of Rhode Island threw out all absentee ballots cast in a primary election, it stressed that "(t)he federal courts were not asked to count and validate ballots and enter into the details of the administration of the election", *id.* at 1078; that, of course, is precisely what the Justice Department asks this court to do now.

In the instant case, the court has found that there was no deliberate act on the part of the election officials; in addition, the electoral process in Dallas County, while far from the colorblind ideal we aspire to as a nation, is controlled and monitored by both white and black officials. For example, while Probate Judge Jones is statutorily responsible for the conduct of elections, his office (which consists of 2 white employees and one black employee, who 'double' as assistant voter registrars) conducts voter registration only two weeks a month; the other half of the year, the duty rests with the Board of Registrars, which has a black chairman and a black majority. Similarly, the Dallas County Commission, which provided assistance during the period at issue here, had three black members to two white members at the time of the events underlying this suit.

Basically, there was an illegal, but unknowing, allowance of out-of-district white votes by a group of white and black election officials, which ultimately led to the election of the white candidate Lide over the black candidate Williams. Although the defendants were probably pleased by this result, the situation nevertheless falls short of a Section 2 violation. "(T)he attitude of the (defendant election officials) may have been shoddy, but it does not justify the 'drastic, if not staggering' procedure ... of a federal court's voiding a state election." *Hamer v. Ely,* 410 F.2d 152, 156 (5th Cir.1969), quoting *Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967). *See also Powell,* 436 F.2d at 84.

### C. Equitable Considerations

■ As the Senate Report to the 1982 amendment to the Voting Rights Act states, "(t)he court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 97–417 at 31, 1982 U.S.C.C.A.N. at 208. However, a court's "traditional powers of equity" also include the power to not act; "(a) new contest is warranted when illegal acts might skew the election returns sufficiently so as to influence the outcome, although consistent with equity's approach, countervailing considerations may induce the chancellor to stay his hand." Kenneth W. Starr, *Federal Judicial Invalidation As A Remedy For Irregularities In State Elections,* 49 N.Y.U.L.Rev. 1092, 1128 (1974). One such consideration weighs heavily on the court's decision in this case.

Before the government sought relief in this court, there was a full and fair adjudication of this election dispute in state court. Both candidates had every opportunity and incentive to settle this dispute in the state forum, and the heft of the trial record speaks volumes about the amount of time, effort and

thought that went into the state case.[21] In the absence of egregious racial discrimination, courts have been extremely reluctant to intervene in state elections previously challenged in state court, especially when the state court could have addressed matters raised in a subsequent federal court action. See, e.g., *Hamer v. Campbell,* 358 F.2d 215, 222 (5th Cir.1966) (Granting relief under the Voting Rights Act "does not mean that we necessarily would set aside every election in which a substantial number of citizens have been denied the right to vote. *This is not a case where an election is challenged for the first time after it is held.*") (emphasis added); *Duncan v. Poythress,* 657 F.2d 691, 701 (5th Cir.1981) ("(F)ully adequate state review procedures provide the appropriate avenue for the redress of inadvertent election mistakes") (citing *Hennings v. Grafton,* 523 F.2d 861 (7th Cir.1975)); *Griffin,* 570 F.2d at 1077 (federal intervention after a state election is adjudicated in state court is appropriate only if the end result retains an element of fundamental unfairness); *Bell,* 376 F.2d at 659. "There is a place for state election laws to operate", *Welch,* 765 F.2d at 1317, and this case falls within that arena.

III. Conclusion

"The federal court is not equipped nor empowered to supervise the administration of a local election." *Griffin,* 570 F.2d at 1077. In the absence of proof of deliberate acts by the defendants, any action by this court would violate that precept. For the foregoing reasons, the government has failed to meet the burden of proof on its constitutional and Voting Rights Act claims; accordingly, the government's requested relief is **DENIED,** and judgment is entered for the defendants.

It is so **ORDERED.**

---

**21.** The Circuit Court transcript contains some 1000 pages.